Chief Judge Breitel.
This is an action by a holder of New York City short-term anticipation notes to declare unconstitutional the New York State Emergency Moratorium Act for the City of New York (L 1975, ch 874, as amd by ch 875). Special Term and the Appellate Division held the act constitutional under both the Federal and State Constitutions.
There should be a reversal. The act violates the State Constitution in denying faith and credit to the short-term anticipation notes of the city. The State Constitution prohibits the city from contracting any indebtedness unless it pledges its "faith and credit” for the payment of the principal of the indebtedness (NY Const, art VIII, § 2). Thus, the Moratorium Act, by depriving short-term noteholders of judicial remedies for at least three years, makes meaningless the verbal pledge *733 of faith and credit. On this view the Federal questions need not be reached.
On November 13, 1975, because of the city’s desperate fiscal paralysis, the Legislature, in Extraordinary Session, passed, and the next day the Governor approved, the New York City Emergency Moratorium Act (L 1975, ch 874, as amd by ch 875). The act imposes a three-year moratorium on actions to enforce the city’s outstanding short-term obligations, namely, tax anticipation notes (TANS), bond anticipation notes (BANS), revenue anticipation notes (RANS), budget notes, and urban renewal notes (URNS). The act provides that the moratorium will be effective only with respect to those noteholders who have been offered, and have declined, an opportunity "voluntarily” to exchange their notes for an equal principal amount of long-term bonds issued by the Municipal Assistance Corporation for the City of New York (MAC). The act also provides that during the moratorium the noteholders who have declined to exchange their notes for MAC bonds are to be paid interest at an annual rate of at least 6%. (§ 5.)
MAC is an intermediate finance agency created to assist the city in its financial stringency (L 1975, ch 169). Neither the faith and credit of the State nor of the city is pledged to the obligations of MAC, but only certain revenues which the city may raise or receive from the State (L 1975, ch 169, § 1, and Governor’s memorandum on approval dated June 10, 1975, McKinney’s 1975 Session Laws of NY, at pp 1744-1745; Public Authorities Law, § 3036; see Wein v State of New York, 39 NY2d 136, 154 [dissenting opn]; cf. Wein v City of New York, 36 NY2d 610, 618).
• After defining the moratorium period as three years from the effective date of the act (§ 2, subd 3), the core moratorium provisions read as follows:
"§ 3. Enforcement of judgments and liens on account of short-term obligations suspended.
"During the moratorium period, and notwithstanding any inconsistent provisions of any law, general, special or local, or of any agreement or short-term obligation, no act shall be done, and no action or special proceeding shall be commenced or continued in any court in any jurisdiction, seeking to apply or enforce against the city, or any political subdivision, agency, instrumentality or officer thereof, or their funds, property, receivables or revenues, any order, judgment, lien, set-off or counterclaim on account of any short-term obliga *734 tion, or the indebtedness or liability evidenced thereby, or seeking the assessment, levy or collection of taxes by or for the city or the application of any funds, property, receivables or revenues of the city on account of any such short-term obligation, or the indebtedness or liability evidenced thereby, although the payment of such short-term obligation may be due by the terms thereof or any general or special or local law or agreement.
"§ 4. Actions upon short-term obligations suspended.
"During the moratorium period, and notwithstanding any inconsistent provisions of any law, general, special or local, or of any agreement or short-term obligation, no action or special proceeding shall be commenced or continued upon any short-term obligation, or the indebtedness or liability evidenced thereby, although the payment of such short-term obligation may be due by the terms thereof or any general or special or local law or agreement.”
On November 14, 1975, the effective date of the Moratorium Act, approximately $5 billion in city notes were outstanding and were scheduled to mature within the following 12 months. Of the $5 billion in notes, about $2.1 billion were held by MAC, $250 million were held by the State, and $1,049 billion were held by 11 New York clearing house banks and various city employees’ pension and bond sinking funds. At about the same time, the clearing house banks and the city funds agreed to extend their notes to July 1, 1986. After two MAC exchange offers, about $1 billion in notes remain with the public, including plaintiff Flushing National Bank.
The bank contends that, in addition to various infirmities under the Federal Constitution and statues, the Moratorium Act violates State constitutional limitations.
The State Constitution regulates closely the debt-incurring power of local governments. Key to this case is that a city may not contract indebtedness unless it has "pledged its faith and credit for the payment of the principal thereof and the interest thereon” (NY Const, art VIII, § 2).
The faith and credit provision was added in 1938. The words "faith and credit” offer no difficulty in understanding and therefore must be read in accordance with their univocal meaning (e.g., Matter of Sherrill v O’Brien, 188 NY 185, 207; Matter of Tuthill, 163 NY 133, 145). Moreover, the term "faith and credit” in its context is not qualified in any way and the *735 records of the Constitutional Convention of 1938 reveal no analysis of the words, let alone any suggestion of a departure from their evident meaning (see Revised Record, New York State Constitutional Convention of 1938, vol II, at p 1076). It is significant that proposals to eliminate the faith and credit clause have been rejected (Temporary State Commission on Constitutional Convention, Local Finance, at pp 125, 127).
A pledge of the city’s faith and credit is both a commitment to pay and a commitment of the city’s revenue generating powers to produce the funds to pay. Hence, an obligation containing a pledge of the city’s "faith and credit” is secured by a promise both to pay and to use in good faith the city’s general revenue powers to produce sufficient funds to pay the principal and interest of the obligation as it becomes due. That is why both words, "faith” and "credit”, are used and they are not tautological. That is what the words say and that is what courts have held they mean when rare occasion has suggested comment (State v City of Lakeland, 154 Fla 137, 139; State v County of Citrus, 116 Fla 676, 694; Sacramento Municipal Utility Dist. v Spink, 145 Cal App 2d 568, 576-577; see Rabinowitz, Municipal Bond Finance and Administration, at p 53; cf. Port of N. Y. Auth. v Baker, Watts & Co., 392 F2d 497, 504). As stated by the Supreme Court of Florida in State v County of Citrus (supra, at p 694): "[T]he effect of such pledge of 'full faith and credit’ is not to create a general or special lien or charge upon the unspecified revenues, moneys or income of the obligor not therein specifically obligated to the payment of such bonds, but is to acknowledge an indebtedness for the amount of money received as a consideration for the bonds, which indebtedness will become enforceable in an ordinary action, should the special contractual obligation as embraced in the bond itself, fail.”
A "faith and credit” obligation is, therefore, entirely different from a "revenue” obligation, which is limited to a pledge of revenues from a designated source or fund (see New York State Temporary Commission on Revision and Simplification of the Constitution, Staff Report No. 35, "Simplifying the Local Finance Article”, at pp 27-28; State v City of Lakeland, supra, at pp 139-140). It is also in contrast to a "moral” obligation, which is backed not by a legally enforceable promise to pay but only by a "moral” commitment.
The constitutional requirement of a pledge of the city’s faith and credit is not satisfied merely by engraving a statement of *736 the pledge in the text of the obligation. The last is a strange argument made by respondents. It is difficult to understand the financial value of such a commitment as contrasted with a "moral” obligation, wisely prohibited by the Constitution for municipalities (NY Const, art VIII, § 2). Instead, by any test, whether based on realism or sensibility, the city is constitutionally obliged to pay and to use in good faith its revenue powers to produce funds to pay the principal of the notes when due. The effect of the Moratorium Act is, however, to permit the city, having given it, to ignore its pledge of faith and credit to "pay” and to "pay punctually” the notes when due. Thus, the act would enable the city to proceed as if the pledge of faith and credit had never been.
It is argued that the city has insufficient funds to pay the notes and cannot in good faith use its revenue powers to pay the notes. The city has an enormous debt and one that in its entirety, if honored as portions become due, undoubtedly exceeds the city’s present capacity to maintain an effective cash flow. But it is not true that any particular indebtedness of the city, let alone the outstanding temporary notes, is responsible for any allocable insufficiency. In short, what has happened is those responsible have made an expedient selection of the temporary noteholders to bear an extraordinary burden. The invidious consequence may not be justified by fugitive recourse to the police power of the State or to any other constitutional power to displace inconvenient but intentionally protective constitutional limitations.
The constitutional prescription of a pledge of faith and credit is designed, among other things, to protect rights vulnerable in the event of difficult economic circumstances. Thus, it is destructive of the constitutional purpose for the Legislature to enact a measure aimed at denying that very protection on the ground that government confronts the difficulties which, in the first instance, were envisioned (see Matter of Board of Educ. v Yonkers Federation of Teachers, 40 NY2d 268, 275). Moreover, in denying access to the courts there is in effect a denial of all remedy. It is elementary that denial of a remedy is a denial of the right (see, e.g., Worthen Co. v Kavanaugh, 295 US 56, 62; cf. Home Bldg. & Loan Assn. v Blaisdell, 290 US 398, 430-434).
It is not only the faith and credit clause of the State Constitution which marks out the constitutional plan for performance of municipal financial obligations. Other parts of *737 article VIII control the debt-incurring or spending power of municipalities and yet also provide exception in order that outstanding debt obligations may be paid (§§ 2-a-6, 7, 7-a, applicable to New York City). Thus, for example, real estate taxes which the city may levy are limited, with certain exceptions, to 2Vz% of the average full valuation of taxable real estate (§§ 10, 11). The limit, however, may be exceeded to provide for all debt service (§ 10). So, too, although the Legislature is given the duty to restrict municipalities in order to prevent abuses in taxation, assessment, and in contracting of indebtedness, it may not constrict the city’s power to levy taxes on real estate for the payment of interest on or principal of indebtedness previously contracted (§ 12). (For a history of the limitations on local indebtedness, see New York State Constitutional Convention Committee [1938], Problems Relating to Taxation and Finance, at ch XIII.)
While phrased in permissive language, these provisions, when read together with the requirement of the pledge of faith and credit, express a constitutional imperative: debt obligations must be paid, even if tax limits be exceeded. A Constitution is no less violated because one would undermine only its prevailing spirit, and, arguably, not its letter (see People ex rel. Burby v Howland, 155 NY 270, 280). However, in this case there is no split; spirit and letter speak in unison.
Thus, it is disingenuous to contend that, since the constitutional language allowing the city to exceed tax limits to pay its indebtedness is in form permissive, it may be disregarded. Similarly disingenuous is the argument that the Legislature has not unconstitutionally restricted the power of the city to levy taxes to pay its indebtedness because the city is "free” under the Moratorium Act to pay the notes if it wishes. The problem is not that, but that the city is free under the questioned legislation not to pay them.
The fourth paragraph of section 2 of article VIII contains an interesting provision which has given rise to a sharp divergence among the respondents. The provision itself and the ensuing divergence confirms, if confirmation be necessary, that the Moratorium Act would boldly override constitutional limitations.
Section 2 provides that "certificates or other evidence of indebtedness issued in anticipation of the collection of taxes or other revenues, or renewals thereof, which are not retired within five years after their date of original issue” must be *738 covered, by appropriation by the issuing municipality, and in default of such appropriation, "a sufficient sum shall be set apart from the first revenues thereafter received and shall be applied to such purposes.” The matter is not left to discretion, for the section goes on to provide that the fiscal officer of the municipality "may be required to set apart and apply such revenues * * * at the suit of any holder of obligations.” Significantly, on oral argument counsel for MAC and the State agreed that the provision is mandatory and beyond valid impairment by the Moratorium Act after five years—a period rapidly approaching its termination. Counsel for the city, for obvious practical reasons, vigorously opposes this view. He would also have this provision rendered unenforceable by the Moratorium Act, which makes no exceptions. He invokes the "police power”, an argument of last recourse.
Actually, the presence of the specific remedy against a defaulting municipality, beyond the generality of the faith and credit clause, is conclusive that the Constitution permits no escape for the municipality from performing its obligations. Nor, if it be necessary to say so, is the specific remedy the exclusive one. The Constitution does not say it should be exclusive and no principle of reason or law suggests that specification of a remedy precludes whatever other remedies are available (see People v New York Cent. & Hudson Riv. R. R. Co., 74 NY 302, 307; 56 NY Jur, Statutes, § 275).
The point is that the Moratorium Act, if it were valid, would bar all remedies for a period of three years. For this there is no warrant. And the city’s position on the appeal and the discussions publicized in connection with the exchange offers of MAC bonds for the temporary notes make quite clear that the noteholders would have to have a life expectancy of longer than three years if they expect the city voluntarily to redeem the notes. In short, if a three-year moratorium be valid, then one for a longer period should be valid, and perhaps too, one so long until all the noteholders take MAC bonds "voluntarily” in exchange for their notes.
It is not without significance that although Special Term and the Appellate Division treated the many Federal constitutional issues, neither offered any analysis to overcome the crux of the case—the faith and credit clause and its implications. As for the respondents they offer only a chimera.
In sum, to hold, as respondents would have the court do, that the operative effect of the faith and credit clause is *739 exhausted when the indebtedness has been incurred would result in an economic and legal chimera. The only practical significance of a pledge of faith and credit with respect to an indebtedness must be in relation to its payment here on earth and on its due day. To interpret the constitutional provision otherwise would be to honor it as a form of window-dressing but to deny it substantive significance.
In reaching this conclusion, the court has no choice in the performance of its judicial and constitutional function (Birnbaum v New York State Teachers Retirement System, 5 NY2d 1, 11-12). With full awareness of practical consequences, it must apply constitutional policy and law to difficult questions (compare Sgaglione v Levitt, 37 NY2d 507, with Wein v City of New York, 36 NY2d 610, supra, and Wein v State of New York, 39 NY2d 136, supra). Indeed, the kind of analysis used in the Wein cases to sustain parts of the emergency program for New York City would have been unnecessary if incantations of "police power” and "financial emergency” could suspend constitutional provisions. Neither life nor law is that easy.
The dissenting opinion in impressive eloquence portrays the dire straits of the city. The portrait is a correct one, but the duty of this court is to determine constitutional issues which sometimes accommodate and sometimes prohibit the facile and sometimes too facile solution of difficult problems. But it is a Constitution that is being interpreted and as a Constitution it would serve little of its purpose if all that it promised, like the elegantly phrased Constitutions of some totalitarian or dictatorial Nations, was an ideal to be worshipped when not needed and debased when crucial.
Turning to the direct points urged in the dissenting opinion, the discussion of two cases cited by the majority as defining the meaning of faith and credit does not support the dissenting position. Of course, those cases, in holding that the liability of the municipality was not limited to specific revenues, demonstrate further the breadth of obligation of pledging faith and credit (State v City of Lakeland, 154 Fla 137, supra; Sacramento Municipal Utility Dist. v Spink, 145 Cal App 2d 568, supra).
One must agree, too, with the dissenting opinion, that the police power (p 749) "may not be limited or restricted by stipulations in private contracts or in those between private parties and governmental units or agencies.” And that the *740 Legislature may not limit the police power. In the first place, the issue in this case does not turn merely on the stipulations of parties to an agreement. In the second place, it does not turn on any statutory command by the Legislature to pledge faith and credit. And, of course, the dissenting opinion (p 754) agrees that the police power may be limited. In short, the police power which may override statutes is not a higher law which transcends Constitutions as well.
The Federal issues are not reached and therefore cases constituting Federal constitutional provisions, especially the impairment clause, cast little light on the State constitutional issues in this case. It is the State Constitution which mandates the certain obligation on the city. It is the State Constitution which commands the municipality to pledge its faith and credit to its debt undertakings, and by inevitable consequence that the documents of undertaking express the pledge. These constitutional provisions are as much a part of the State Constitution as the language from which the police power is implied or the express wording of the so-called emergency clause (art III, § 25).
The invocation of the emergency clause in the State Constitution is of little avail. Its history and language bespeak the frigid years of the Cold War and the threat of nuclear decimation (Memorandum of Joint Legislative Committee on Interstate Cooperation, NY Legis Ann, 1963, p 221).* Its purpose was to provide for a functioning and continuing government, even if many officers of the several branches of government and their quarters had been atomized in a nuclear Armageddon, free of the constitutional limitations. Most important, it refers only to the continuity of governmental operations in the direct sense. Obviously, it does not mean and may not mean that the Constitution is always suspended in every emergency in a world and life that is a succession of emergencies, natural and manmade.
* * *
Emergencies and the police power, although they may modify their applications, do not suspend constitutional principles. It is not merely a matter of application to interpret the words of the Constitution and obligations issued subject to the Con *741 stitution to mean exactly the opposite of what they say. The notes in suit provided that the city pledged its faith and credit to pay the notes and to pay them punctually when due. The clause and the constitutional mandate have no office except when their enforcement is inconvenient. A neutral court worthy of its status cannot do less than hold what is so evident.
The city and State, and to some extent the National Government, for almost two years have been engaged in a most difficult struggle to resolve the city’s grave fiscal and economic problems. For well over a year many financial transactions have occurred on the assumption, however strained, that the moratorium would be constitutionally acceptable. In order to minimize market and governmental disruptions which might ensue it would be injudicious at this time to allow the extraordinary remedies in the nature of injunction and peremptory mandamus sought by plaintiff. Plaintiff and other noteholders of the city are entitled to some judicial relief free of throttling by the moratorium statute, but they are not entitled immediately to extraordinary or any particular judicial measures unnecessarily disruptive of the city’s delicate financial and economic balance. (Cf. Worthen Co. v Kavanaugh, 295 US 56, 62, supra.) It is significant too that the Legislature will shortly meet in regular annual session and will be in a position once again to treat with the city’s problems and to seek a fiscal solution in the light of the holding in this case. (New York State Bankers Assn. v Albright, 38 NY2d 430, 441; cf. Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1, 14.) It would serve neither plaintiff nor the people of the City of New York precipitately to invoke instant judicial remedies which might give the city no choice except to proceed into bankruptcy. The strenuous and valiant efforts by the city and State administrations, with the aid of the National Government, should be given as much leeway as constitutional decency permits. Yet none of this means that remedy can be denied to plaintiff or to noteholders beyond the short period necessary to prepare for the consequences of the determination to be made in this case.
Accordingly, the order of the Appellate Division should be reversed, with costs, the moratorium statute declared unconstitutional, and the proposed remittitur settled on 30 days’ notice.
*742 APPENDIX
GOVERNMENT
Memorandum of Joint Legislative Committee on Interstate Cooperation
Continuity of government operations
A. I. 24, Pr. 24, L. Lawrence* To Sec. of State
Constitution, Art. 3, § 25, new. The proposed amendment is an enabling measure, the purpose of which is to empower the Legislature to insure as far as possible the continuity of governmental operations throughout the State in periods of emergency brought on by enemy attack. It has no self-executing provisions; it requires legislative action. This amendment follows the form of the model amendment proposed by the Council of State Governments and the Office of Civil and Defense Mobilization. Its purpose is to permit the Legislature to provide for continuity of government unimpaired by constitutional inhibitions designed for the normal operation of the state government. The amendment will clear the way for legislative action in a number of areas where provision has to be made for emergency government to meet the extraordinary conditions that would follow enemy attack in the modern world.
A major concern of the amendment is the supply of manpower for keeping the governmental machinery in operation. Thus it deals specifically with the power to establish lines of succession to the powers and duties of public offices. As indicated by the phrase "of whatever nature”, the power is broad enough to be applicable to legislative, judicial, executive and administrative offices. It is broad enough, for example, to authorize legislation in connection with "automatic” interim succession in depth to public office, in case of post-attack vacancy for any reason.
The grant is not restricted to manpower alone. It authorizes the adoption of measures of any kind relating to the continuity of operations. Here the aim is, after the manner of the "necessary and proper clause” of the national constitution, to equip the Legislature with a fair range of power in the choice of means.
However, the amendment gives no blank check to the Legislature. On the contrary, the power is subject to limitations. For one thing, they are implicit in the structure of the amendment. Thus the amendment is phrased in terms of a grant of new power (not removal of limits on existing powers) for the attainment of a stated objective, namely, continuity of governmental operations.

 The memorandum is attached as an appendix to this opinion.

 Passed for first time in 1962 (A. I. 1492, L. Lawrence); to be submitted to voters at General Election of 1963.