In the Matter of SUBWAY-SURFACE SUPERVISORS ASSOCIATION, Appellant-Respondent, v NEW YORK CITY TRANSIT AUTHORITY, Respondent-Appellant. STATE OF NEW YORK, Intervenor-Respondent.

Second Department, January 31, 1977

*Moss K. Schenck* for appellant-respondent.

*Stuart Riedel (James P. McMahon* and *Helen R. Cassidy* of counsel), for respondent-appellant.

*Louis J. Lefkowitz, Attorney-General (George D. Zuckerman* and *Samuel A. Hirshowitz* of counsel), for intervenor-respondent.

HOPKINS, Acting P. J. The petitioner is a labor union representing certain supervisory employees of the respondent, the New York City Transit Authority. The petitioner and the respondent entered into a collective bargaining agreement effective October 1, 1974 and terminating September 30, 1976. That agreement provided for certain benefits to the members of the petitioner, such as a 5% wage increase due October 1, 1975, as well as an obligation of the respondent to pay certain wage increments and a 4% increase in shift differential pay. The benefits were suspended under the provisions of the New York State Financial Emergency Act for the City of New York (FEA) (L 1975, chs 868-870). This CPLR article 78 proceeding was brought by the petitioner labor union to declare those provisions of the statute unconstitutional.

The Special Term held that the statute was constitutional. We modify the judgment by: (1) declaring the statute unconstitutional insofar as it prevents the use of suspended wage increases and the other benefits in the computation of the pension base of retirement allowances; and (2) adding the provision that the offer of the wage deferral agreement shall be subject to subdivision 2 of section 10 of the statute. In all other respects we affirm.

I

The respondent is a public benefit corporation (Public Authorities Law, art 5, tit 9) which operates the transit facilities of New York City. The city has made payments to the respondent for certain purposes: (1) for the carriage of school chil-

dren at reduced fares, the sum of approximately $47,000,000 yearly; (2) for the redemption of promissory notes and revenue anticipation notes of the respondent, the sum of $25,100,000 yearly (L 1972, ch 7); (3) for operating expenses, the sum of $70,000,000 as a matching fund for an equivalent payment by the State of New York (L 1975, ch 56); and (4) for subway cars, the sum of $5,200,000 yearly (see Public Authorities Law, § 1207-a). The respondent executed a collective bargaining agreement with the petitioner, the representative of supervisory employees. That agreement, effective October 1, 1974 and terminating September 30, 1976, provides for wage increases and increases in night differential payments as of October 1, 1975.

FEA was enacted in September, 1975 in response to the fiscal emergency arising in the affairs of New York City (L 1975, chs 868-870). Part of its provisions imposes a wage freeze, suspending, specifically, increases in salaries or wages, and increases in wage differentials stipulated in existing collective bargaining agreements, to take effect after June 30, 1975 (L 1975, ch 868, § 2 [FEA, § 10], as amd by L 1975, ch 870, § 11).* Moreover, the statute provides that the suspension

---

*The statute in relevant parts, reads as follows:

"1. Increases in salary or wages of employees of the city and employees of covered organizations which have taken effect since June thirtieth, nineteen hundred seventy-five or which will take effect after that date pursuant to collective bargaining agreements or other analogous contracts, now in existence or hereafter entered into, requiring such salary increases as of July first, nineteen hundred seventy-five or as of any date thereafter are hereby suspended. All increased payments for holiday and vacation differentials, shift differentials, salary adjustments according to plan and step-ups or increments for employees of the city and employees of covered organizations which have taken effect since June thirtieth nineteen hundred seventy-five or which will take effect after that date pursuant to collective bargaining agreements or other analogous contracts requiring such increased payments as of July first, nineteen hundred seventy-five as of any date thereafter are hereby, in the same manner, suspended. For the purposes of computing the pension base of retirement allowances, the suspended salary or wage increases and the suspended other payments shall not be considered as part of compensation or final compensation or of annual salary earned or earnable. The suspensions provided herein shall be effective for the first pay period ending on or subsequent to September first, nineteen hundred seventy-five and shall continue until one year thereafter and, to the extent of any determination of the board that a continuation of such suspensions, to a date specified by the board, is necessary in order to achieve the objectives of the financial plan, such suspensions shall be continued to the date specified by such board, which date shall in no event be later than the end of the emergency period.

"2. This section shall not be applicable to employees of the city or employees of a covered organization covered by a collective bargaining agreement or an employee of the city or a covered organization not covered by a collective bargaining agreement

shall not be applicable in the event the employees or their collective bargaining representatives have agreed in writing to a deferment of the increases.

These provisions are assailed in this proceeding on four fronts: (1) that the statute unconstitutionally abrogates contractual relations; (2) that it violates the equal protection clause, in that it provides for unfair and discriminatory classifications; (3) that it conflicts with the bankruptcy clause of the Federal Constitution and the bankruptcy laws enacted by Congress; and (4) that it impairs the pension clause of the State Constitution.

## II

The petitioner does not challenge the existence of a financial emergency in New York City. Nor does it challenge the power of the State to regulate contractual relations when the interests of public health, safety and general welfare so demand (see, e.g., *Home Bldg. & Loan Assn. v Blaisdell,* 290 US 398, 428; *East New York Bank v Hahn,* 326 US 230, 232-233). It directs its assault against the statute, instead, on the ground that the suspension of the payment of wage increases was not necessary to meet the emergency created by the city's financial deficit. In substance, it argues that the respondent is an autonomous public benefit corporation which, by other feasible financial means, can continue its operations without reliance on city funds, and that, accordingly, the statutory regulation of the collective bargaining agreement is unjustified.

To buttress that argument, the petitioner observes that the city is not a party to the collective bargaining agreement between the petitioner and the respondent, that the wages of the employees under the agreement are not paid from the city's treasury, and that the subsidies supplied by the city to the respondent are purely voluntary and can be withheld

where the collective bargaining representative or such unrepresented employee has agreed to a deferment of salary or wage increase, by an instrument in writing which has been certified by the mayor on or before September first, nineteen hundred seventy-five, or certified by the board after September first, nineteen hundred seventy-five as being an acceptable and appropriate contribution toward alleviating the fiscal crisis of the city. The board may, if it finds that the fiscal crisis has been sufficiently alleviated or for any other appropriate reason, direct that the suspensions of salary or wage increases or suspensions of other increased payments shall, in whole or in part, be terminated."

without material injury to the respondent's operations, since the respondent is empowered by the statute to raise the revenue required to support its system.

The provisions of FEA, on the other hand, expressly include the respondent, as well as other governmental agencies and public authorities which receive funds, directly or contingently, from the city (L 1975, ch 868, § 2 [FEA, § 2, subd 5]). The argument of the petitioner, in essence, is that the Legislature was without substantial grounds to treat the respondent as an arm of the city and to subject it to the same fiscal restrictions as those imposed on the city. That treatment was, of course, a choice whose wisdom the courts cannot question, provided that a reasonable nexus exists between the city and the respondent (see *Montgomery v Daniels,* 38 NY2d 41, 56; *Matter of Taylor v Sise,* 33 NY2d 357, 365). The nexus is clearly provided by the statutory expression that the purpose of the respondent "shall be the acquisition of the transit facilities" of the city (Public Authorities Law, § 1202, subd 1), and "shall be regarded as performing a governmental function" (Public Authorities Law, § 1202, subd 2; see *New York City Tr. Auth. v Loos,* 2 Misc 2d 733, affd 3 AD2d 740). Moreover, other statutory provisions disclose an interlocking of its functions with the city (see, e.g., Public Authorities Law, § 1204, subds 6, 10, 12, 15; § 1205, subd 4; §§ 1205-a, 1210, 1219-a, subd 2). Nor may we close our eyes to the undeniably close relationship which the transit system of the respondent has always borne to the city, serving as it does the necessity of quick and convenient passage throughout the urban areas.

By corresponding logic, we cannot declare the statute unconstitutional because the city might avoid its fiscal crisis by discontinuing the payments which it now makes to the respondent. It is doubtful, indeed, whether the city could lawfully refuse to make certain payments which are loosely characterized by the petitioner as subsidies (e.g., the payments made pursuant to section 1207-a of the Public Authorities Law and chapter 7 of the Laws of 1972). But, aside from that aspect, legislation does not infringe constitutional limits because it is founded on decisions falling plainly within the powers of the government body *(Wasmuth v Allen,* 14 NY2d 391, 397-398). Perhaps the financial difficulties of the city might be lessened, or even eliminated, by a decision of the city to withhold its current payments in support of the respondent, but on the other hand, perhaps the exigencies of the fare structure and

the efficient management of the transit system effectively negate such a decision. All of these reflections are simply speculations; the constitutionality of the statute cannot depend on the resolution of that kind of hypothetical approach.

We find, therefore, no substance to the argument that the statute unconstitutionally abrogates existing contractual rights because the Legislature ignored more feasible methods to relieve the city's financial plight.

### III

The petitioner's contentions under the equal protection clause are twofold. First, it is said that city bond and note holders are unfairly preferred under the statute because their debts are not frozen, but merely deferred to a new due date of payment with interest.

The strength of this contention has been intensified by the recent decision of the Court of Appeals holding as violative of the State Constitution (art VIII, § 2) those provisions of the New York State Emergency Moratorium Act for the City of New York (L 1975, ch 874, as amd by ch 875) which enforce the deferment of short term obligations of the city (*Flushing Nat. Bank v Municipal Assistance Corp. for City of N.Y.,* 40 NY2d 731). Nevertheless, we do not think that the difference in treatment under the statutes between the payment of wages to become due to respondent's employees under the agreement and the payment of indebtedness represented by bonds and notes of the city abridges the equal protection clause.

As the opinion of the Court of Appeals (per Chief Judge BREITEL) evinces, the debt owing to bond and note holders has the constitutional guarantee of the faith and credit of the city —a pledge which cannot be destroyed by a statutory declaration of a moratorium. We are not considering here, of course, that category of an obligation which rests on a constitutionally prescribed pledge of the full faith and credit of the city. We deal here, rather, with a contractual provision for the payment of wages over a period of time covered by a labor agreement.

Nor is the contractual provision one enhanced to the rank of a judgment following compulsory arbitration as was considered in *Patrolmen's Benevolent Assn. of City of N.Y. v City of New York* (41 NY2d 205). In that case, indeed, it was made

clear by the Court of Appeals (per WACHTLER, J.) that the statute constitutionally suspended wage increases pursuant to collective bargaining agreements.

Different things may, of course, be treated differently by the Legislature. The primary test under the guarantee of equal protection of the law is whether the classification involves one that is suspect because of race or national origin (see *McLaughlin v Florida,* 379 US 184; *Hernandez v Texas,* 347 US 475), or affects a fundamental right, such as the voting franchise or privacy *(Kramer v Union School Dist.,* 395 US 621; *Eisenstadt v Baird,* 405 US 438), in which instances a compelling State interest, not attainable by less restrictive methods, must be demonstrated to sustain the classification. The classification of economic interests relates neither to suspect categories nor to fundamental rights (cf. *Ferguson v Skrupa,* 372 US 726, 732-733; *Welch v Henry,* 305 US 134, 144; *Metropolis Theatre Co. v Chicago,* 228 US 61, 69-70). Indeed, the power of the Legislature to regulate fiscal affairs is greater, in relation to the equal protection clause, than in any other field *(Madden v Kentucky,* 309 US 83, 87-88; *San Antonio School Dist. v Rodriguez,* 411 US 1, 24, 29). Hence, the test which follows this analysis is whether the difference in treatment of the two classes of creditors in the statute has a rational basis (see *Dandridge v Williams,* 397 US 471, 485; *McGowan v Maryland,* 366 US 420, 426).

Apart from the obvious legal distinctions between bond and note holders from employees in their status vis-à-vis the city, the State Constitution has granted to the former a preference over other creditors *(Flushing Nat. Bank v Municipal Assistance Corp. for City of N.Y.,* 40 NY2d 731, *supra).* That does not mean that the State Constitution renders the statute per se immune from the strictures of equal protection, but it does reinforce the rationality of the choice made by the Legislature in formulating the classification. The Legislature could justifiably regard a creditor who loans money to a municipality to possess a claim of different quality from one whose debt arises from wages.

The second claim of denial of equal protection is that the petitioner was not offered the privilege, accorded to other unions, of accepting a voluntary deferral agreement. That claim is blunted by the provision in the judgment which ordered the respondent to offer the members represented by

the petitioner such a deferral agreement. We deal further with the decretal provision beyond.

## IV

The petitioner argues that the statutes impermissibly sanction only the promulgation of a plan for the payment of the city's debts which recognizes the priority of the obligations of bond and note holders (see L 1975, ch 868, §§ 1, 2, 12, 21 [FEA, § 8, subd 6; § 9, subd 4; State Finance Law, § 92-e; Public Authorities Law, § 3036-a)—a composition in violation of the Federal Constitution and statutes (US Code, tit 11, § 403, subd a; cf. *Perry v Commerce Loan Co.,* 383 US 392, 398-399). We see nothing in the Federal bankruptcy laws which bars the provisions of FEA and, indeed, as we read *Perry,* to the limited extent it bears upon the issue here, it supports, rather than undermines, the constitutionality of FEA (cf. *City of Mount Vernon v Mount Vernon Trust Co.,* 270 NY 400).

## V

The petitioner contends that the provisions of FEA (L 1975, ch 868, § 2 [FEA, § 10, subd 1]) which prohibit the calculation of pension benefits based on the suspended wage increases is unconstitutional. The State Constitution (art V, § 7) is explicit: "membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired."

The pension rights of the members represented by the petitioner consequently enjoy constitutional status in contrast to their rights to immediate payment of the increases in wages under the labor contract. That constitutional status demands strict enforcement of the direction that their pension rights may not be impaired (see *Sgaglione v Levitt,* 37 NY2d 507; *Kleinfeldt v New York City Employees' Retirement System,* 36 NY2d 95; *Matter of Donner v New York City Employees' Retirement System,* 33 NY2d 413; *Kranker v Levitt,* 30 NY2d 574). The wage increases, it must be observed, have not been canceled by the respondent (even assuming that the respondent could legally do so); they have merely been suspended until payment in the future.

The statute by which the pension rights are structured (Retirement and Social Security Law, § 2, subd 2, par a)

determines the pension based not on wages "paid", but on wages "annually earnable", thus indicating the intent that the pension should be calculated on benefits not necessarily payable in money prior to the time of retirement, such as accumulated vacation credits *(Kranker v Levitt,* 30 NY2d 574, 575, *supra),* or termination pay *(Matter of Weber v Levitt,* 34 NY2d 797, 799-800, affg on opn at 41 AD2d 452, 463). Inherent in *Kranker* and *Weber* is the strict acknowledgment of the constitutional protection of pensions. All employees similarly situated should be treated without discrimination, so that, for the purpose of computing pension benefits, an employee retiring sooner than the time the suspension of a wage increase is finally lifted should not be deprived of the same credits which his fellow employee retiring after the end of the suspension would receive. If it were held otherwise, the pension of the earlier retiring employee would clearly be diminished or impaired.

We do not find that *Hoar v City of Yonkers* (295 NY 274) compels a contrary conclusion. There the City Council reduced the annual salary of the employee from $3,000 to $2,625, but, by a subsequent local law, provided that the employee would be entitled to pension rights based on the $3,000 salary, unless the employee elected to have his pension computed on the reduced salary. The Court of Appeals decided that, under the pleadings, it was not enabled to weigh the rights which the employee had acquired through the local law. It then held that the constitutional protection afforded pensions did not forbid the City Council from reducing or increasing the employee's salary used as a base for a pension.

*Hoar* presents a state of facts not comparable to the case here. The record before us demonstrates a wage schedule agreed to under collective bargaining within the Taylor Law (Civil Service Law, art 14), and a subsequent statute not effecting a reduction in pay but a suspension of the current payment of the promised increase until a point of time in the future.

We conclude, therefore, that the statute barring the calculation of pension benefits on the wage increase effective under the contract is an unconstitutional impairment of the rights of the employees represented by the petitioner.

## VI

There remains the issue of the respondent's cross appeal,

which is aimed at that part of the Special Term's judgment which directs the respondent to offer the employees represented by the petitioner a voluntary deferral agreement "similar to those heretofore certified by the Mayor of the City of New York and/or the Emergency Financial Control Board." The respondent complains that this provision does not make clear that the agreement must be one in compliance with subdivision 2 of section 10 of the FEA.

We do not think that the Special Term's judgment was intended to dilute any provision of the FEA, and ordinarily we would interpret it to mean that the judgment must necessarily be effectuated within the scope of the provisions of FEA. But, in order to obviate any possible misunderstanding, that part of the judgment should be modified by adding language denoting that the direction is to be carried out in compliance with subdivision 2 of section 10.

The judgment appealed from, hence, should be modified by declaring subdivision 1 of section 10 of the FEA unconstitutional insofar as it affects the calculation of pension benefits by prohibiting the use of the wage increase, and by adding the provision that the offer of the wage deferral agreement shall be subject to subdivision 2 of section 10 of the FEA and affirmed in all other respects.

DAMIANI, RABIN, SHAPIRO and HAWKINS, JJ., concur.

Judgment of the Supreme Court, Kings County, dated March 9, 1976, modified, on the law, by (1) adding to the first decretal paragraph thereof, after the words "the New York Constitution", the following: "except that insofar as subdivision 1 of section 10 of the said act affects the calculation of pension benefits, it is in violation of section 7 of article V of the New York State Constitution" and (2) adding to the second decretal paragraph thereof a provision that the wage deferral agreement shall be subject to the provisions of subdivision 2 of section 10 of the Financial Emergency Act for the City of New York. As so modified, judgment affirmed, without costs or disbursements. There are no disputed findings of fact.