OPINION OF THE COURT
Jones, J.
In this case we confront the issue not reached in Patrolmen’s Benevolent Assn. of City of N. Y. v City of New York (41 NY2d 205) — whether the New York State Financial Emergency Act for the City of New York is unconstitutional insofar as it precluded payment of wage increases provided in an *107 existing collective bargaining agreement. We conclude that it is not.
Petitioner is the certified exclusive bargaining representative of several classes of supervisory personnel employed by respondent New York City Transit Authority, which is the public benefit corporation created by the New York State Legislature for the purpose of operating and maintaining mass surface and subway transit facilities owned by the City of New York and leased to the authority. Under a collective bargaining agreement entered into by the parties for the period from October 1, 1974 through September 30, 1976 the authority was obligated on October 1, 1975 to provide certain wage increases — namely, a 5% general wage increase, continuation of increased payments of specified increments and a 4% increase in shift differential.
Payment of these increases was barred however by action of the State Legislature in August, 1975 when it enacted the New York State Financial Emergency Act for the City of New York (FEA; L 1975, chs 868-870).[1] The legislation by which this was accomplished, adopted at an extraordinary session, contained findings that a financial emergency existed in the City of New York, recited disasters that might be expected to befall the city in the event of its failure to meet its obligations to holders of outstanding securities and the need for the State to exercise its police and emergency powers under the Constitution to bring the emergency under control, and provided for a number of remedial measures, including the suspension of increases in salaries and wages, shift-differentials and increments effective after June 30, 1975 to employees of the city and of "covered organizations”, one of which as expressly named was respondent Transit Authority. It was also provided that for the purposes of computing the pension base of retirement allowances the suspended increases should not be considered as part of compensation or of annual salary earned or earnable. The suspensions were to be effective for the first pay period ending on or after September 1, 1975 and to continue for one year or until such later date as deemed necessary by the Emergency Financial Control Board (also created by the statute) to achieve the objectives of a financial plan devised by it, but in no event later than the end of the emergency period. Subdivision 2 of section 10 of FEA, which section imposed the *108 wage freeze, provided that the section would be inapplicable to employees of the city or of a covered organization whose collective bargaining representative executed an agreement for deferment of salary or wage increases which was certified by the Mayor prior to September 1, 1975, or thereafter by the Financial Control Board, "as being an acceptable and appropriate contribution toward alleviating the fiscal crisis of the city”.
Following implementation of the wage freeze by the Transit Authority, petitioner instituted the present article 78 proceeding by which it sought a judgment declaring the legislation unconstitutional as violative of the contract impairment clause of the Federal Constitution, the equal protection clauses of the Federal and State Constitutions, and the provisions of the State Constitution prohibiting impairment of pension rights, and directing respondent to comply with the provisions of the collective bargaining agreement. Special Term treated the proceeding as a declaratory judgment action and rejected petitioner’s claims of unconstitutionality but ordered that a wage deferment agreement similar to those already executed and certified as to other groups of employees under FEA be made available to petitioner. The Appellate Division modified by declaring that, insofar as the wage freeze of FEA affects the calculation of pension benefits, it is in violation of section 7 of article V of the New York State Constitution and by adding a provision that the wage deferment agreement that Special Term had directed be made available to petitioner should be subject to the provisions of subdivision 2 of section 10 of the act. As so modified the judgment was affirmed.
The case is before us on cross appeals; petitioner appeals from that portion of the Appellate Division’s order that upheld the constitutionality of the wage freeze apart from its effect on pension computations, and the Attorney-General of the State of New York as intervenor[2] appeals from that portion of the order that held FEA constitutionally invalid insofar as it affects pension computations.
The latter appeal may be disposed of promptly. Following determination of the appeal at the Appellate Division, as contemplated by the provisions of subdivision 2 of section 10 *109 of FEA and the orders in both courts below, on March 10, 1977 petitioner, as collective bargaining representative of Transit Authority employees, and the Transit Authority entered into a wage deferment agreement, subsequently ratified by the Financial Control Board, which provided that a portion of the wage increases included in the collective bargaining agreement would be paid but that another portion would be deferred. The agreement further provided however that "For the purposes of computing retirement allowances * * * the salary rate during the period of deferral shall be treated as including the amount of the deferred increase”. As a consequence of this provision agreed to by the Transit Authority, pension computations have been made as though the wages provided for in the collective bargaining agreement had in fact been paid; thus there has been no change in the wage base used in calculation of pension benefits as a result of the enactment of FEA over what the base would have been had the statute not been enacted. Petitioner therefore now has no standing to challenge the bare provision of the statute as an impairment of the right to pension benefits protected by section 7 of article V of the New York State Constitution. Accordingly, the case should be remitted to Special Term for dismissal of the petition insofar as it seeks a judgment that the statute is violative of that constitutional provision.
 We turn then to petitioner’s assertions that the wage freeze mandated by subdivision 1 of section 10 of FEA is an impairment in violation of the contract clause of the Federal Constitution. Indisputably FEA worked an impairment of contract rights under the collective bargaining agreement between the parties. We reject the contention, however, that such impairment violates the constitutional contract clause. It is conceded that the protection constitutionally extended to the integrity of contracts is not unlimited. Petitioner acknowledges that the State, in the exercise of its police power, may override the provisions of a contract when the impairment is "reasonable and necessary to serve an important public purpose” (United States Trust Co. v New Jersey, 431 US 1, 25); it is asserted, however, that the police power "must be exercised for an end which is in fact public and the means adopted must be reasonably adapted to the accomplishment of that end and must not be arbitrary or oppressive” (Treigle v Acme Homestead Assn., 297 US 189, 197, reh den 297 US 728). We note that petitioner quotes, without distinction, the standard for *110 the exercise of police power that results in an alleged impairment of a public contract and that applicable when it is claimed that the provisions of a private contract are being impaired. If by "standard” it is intended to refer to the general proposition that "an impairment may be constitutional if it is reasonable and necessary to serve an important purpose” (United States Trust Co. v New Jersey, 431 US 1, 25, supra), the standard is indeed the same. In the present instance, such verbalization does not, however, advance analysis or aid in resolution. What is of legal and practical significance is to recognize that the application of this standard will be different in public contract cases than it is in private contract cases. "[C]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate [in the former category] because the State’s self-interest is at stake” (id., p 26).
At the threshold of the application of the general standard to the present case, we note that petitioner fully accepts without intimation of doubt the reality of the financial crisis found by the Legislature to confront the City of New York. No challenge is raised to the validity of the Legislative finding and no invitation is made to judicial scrutiny of the Legislature’s determination in this regard.[3] Thus, it is undisputed that the FEA wage freeze serves "an important purpose”. The critical focus of analysis must be directed to whether the means chosen by the Legislature to serve that purpose are "reasonable and necessary” so as to escape what would otherwise be the strictures of the contract clause.
*111 The petitioner first bases its attack on FEA as applied to the Transit Authority on the argument that suspension of wage increases in the collective bargaining agreement between petitioner and the Transit Authority of the city was not necessary to meet the city’s financial emergency because the Transit Authority is an independent agency separate from the city and further because, it is asserted, the Transit Authority had available to it means for obtaining funds necessary to its functioning quite apart from the funds it obtains from the City of New York, such that the city could terminate its payments to the authority.
Both courts below have addressed the first branch of this argument and have found it without merit, as do we. The intertwinement between the city and the Transit Authority and of their finances is amply demonstrated. In recognition of this relationship the New York State Legislature has declared that in the operation and maintenance of the city’s mass transportation facilities the authority "shall be regarded as performing a governmental function”. (Public Authorities Law, § 1202, subd 2.) In the performance of that function the authority receives a substantial portion of its financial support from city funds, including: provisions for capital costs which by statute the city is required to make (Public Authorities Law, § 1203), payments which make up revenue which would otherwise be lost as the result of a reduced fare program for the elderly instituted at the request of the city (about $20,000,000 annually), a subsidy to provide reduced fares for school children (about $47,000,000 annually), and a contribution to operating expenses in the form of assumption of the cost of the Transit Police Department in the sum of approximately $92,000,000 a year. Additionally, the receipt of capital funds from both the Federal and State governments and of operating funds from the State of New York is dependent on payment of funds to the authority by the City of New York for like purposes. In both instances the subsidies run into the millions of dollars.
Faced with the financial distress under which the city was laboring and which threatened to overwhelm it, and with the interdependence between the finances of the city and of the Transit Authority, which was performing governmental functions of the city, the New York State Legislature determined that the imposition of the terms of the wage-freeze legislation on the employees of the authority, as well as on those em *112 ployed by the city itself and by other related organizations,[4] was a necessary and appropriate step toward relieving the financial crisis and thereby continuing the performance of governmental services. While "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State’s self-interest is at stake” when legislation impairing public contracts is at issue (United States Trust Co. v New Jersey, 431 US 1, 26, supra), the statement of the principle itself implies that some deference at least is appropriate. Here, little deference is required, when the circumstances themselves so clearly demonstrate that the Legislature’s conclusion was a valid one. To contend, in the face of the considered and explicit inclusion of the Transit Authority by the Legislature, that for purposes of FEA the authority is an independent agency separate from the City of New York is wholly unrealistic.
With respect to the second branch of petitioner’s argument —that other means are available to the Transit Authority to meet its financial needs and thus its collective bargaining obligations — it suffices to observe that this contention is advanced only in argument. Nowhere in the record is there any support for the bald statement, nor is there any demonstration that the authority could continue to perform its governmental functions without the very substantial financial assistance it receives both from and on account of contributions provided by the City of New York.
Concluding that there is no basis on which to disturb the legislative finding that the imposition of the wage freeze on employees of the Transit Authority was necessary to the alleviation of the existing financial crisis, we move to a consideration of the reasonableness of the remedy. Here, too, we find no constitutional infirmity.
In reaching the result we do, we attach significance to the fact that the impairment of contract accomplished by the wage freeze provisions of FEA was prospective in nature. *113 Thus, when the statute was enacted in August, 1975, the personal services for which the Transit Authority would be obligated under the existing collective bargaining agreement to pay increased wages after October 1 of that year had not yet been rendered. Full consideration had not passed from the employees and, as regards the services for which compensation at the increased rates provided by the agreement would be paid, the contract of employment was still executory. As noted above, petitioner, acting as bargaining agent for the affected employees, recognized the extreme financial predicament of the city and after negotiations on March 10, 1977 executed what must be taken in the circumstances to be an acceptable substitute compensation plan. In a theoretical sense, if the consequence of the mandated FEA suspension of increases in wages that had previously been bargained for was unacceptable to employees represented by petitioner, it was possible for them, after the extraordinary legislative session, still to withhold the principal consideration to come from them — namely, the personal services to be rendered to the Transit Authority — and, departing from its employ, to offer those services elsewhere. Thus, by its terms, FEA effected a limited intrusion on the contract rights petitioner had secured for the employees represented by it under the collective bargaining agreement; there was neither termination of existing employment nor deprivation of payment for services that had been rendered in the past. The effect was substantially less than what would have occurred had the statute withheld or reduced payment for services or consideration already performed or delivered — as for instance, by impairing the right to payment of suppliers who had delivered goods, contractors who had erected structures or bondholders who had advanced funds, all creditors who had fully performed their obligations under contracts with the city or with covered organizations.
Confronted with the necessity to lighten the financial burden under which the city was laboring, the Legislature’s choice of prospective impairment of executory aspects of wage contracts was reasonable. We therefore conclude that the enactment of FEA constituted a necessary and reasonable address to a concededly important public purpose.
As another ground for challenge to FEA, petitioner asserts that it has been denied equal protection of the laws in violation of Federal and State Constitutions. It predicates its *114 argument on its reading of the statute as giving holders of bonds and other certificates of debt a preferred position over that of employees subject to the wage freeze. Petitioner originally complained that payments to the former were only deferred, not permanently lost, as are the wage increments which cannot be paid to employees, and noted that the lenders were also given a right to accrual of interest during the period of deferment. Based on the decision of our court in Flushing Nat. Bank v Municipal Assistance Corp. for City of N. Y. (40 NY2d 731), in which we held the New York State Emergency Moratorium Act for City of New York (L 1975, ch 874, as amd by ch 875) unconstitutional, petitioner presses its argument with renewed vigor.
Even were petitioner’s argument to be taken in its most extreme formulation — that the rights of bond and note holders were unaffected while employees were deprived of future wage increases — we would nonetheless conclude that such differentiated treatment would not contravene the equal protection clauses of our Constitutions. We adopt the decisive repudiation of petitioner’s claims articulated by Mr. Justice James D. Hopkins at the Appellate Division. We would further note, as stated above, that there is a significant and rational difference between impairment of governmental obligations arising out of contracts under which the engagement of the other contracting party is still executory and impairment of those arising out of contracts fully performed.
There is still another predicate for making a valid differentiation between obligations owed bondholders and those owed wage earners; the Legislature might well have concluded that the impact on the maintenance of governmental operations and services would be significantly greater and potentially more destructive if there were impairment of the right of holders to payment of their bonds and notes than if a freeze was placed on future wage increases. A default by the city on its promises to its lenders might be expected to have consequences affecting the ability of the city to obtain funds for the performance of its governmental functions well into the future and in a scope far broader than might be expected to attend the imposition of a suspension of wage increase payments. Indeed, an adverse effect on the power of the city to borrow on either short or long-term obligations might impair its ability not only to pay increases in wages but even to pay wages themselves.
*115 Finally, petitioner argues that the wage freeze of FEA constitutes a "plan of composition” in violation of Federal bankruptcy law and an intrusion into an area vested exclusively in the Federal judicial system. We reject this argument as did the courts below.
Accordingly, for the reasons stated, the order of the Appellate Division should be modified, without costs, to the extent of remitting the case to Special Term with directions to dismiss the petition insofar as it seeks a declaration that FEA violates section 7 of article V of the New York State Constitution, and, as so modified, the order should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Wachtler, Fuchsberg and Cooke concur.
Order modified, without costs, and the matter remitted to Special Term for further proceedings in accordance with the opinion herein and, as so modified, affirmed.
APPENDIX
NEW YORK STATE FINANCIAL EMERGENCY ACT FOR THE CITY OF NEW YORK
"§ 10. Wage Freeze.
"1. Increases in salary or wages of employees of the city and employees of covered organizations which have taken effect since June thirtieth, nineteen hundred seventy-five or which will take effect after that date pursuant to collective bargaining agreements or other analogous contracts requiring such salary increases as of July first, nineteen hundred seventy-five or as of any date thereafter are hereby suspended. All increased payments for holiday and vacation differentials, shift differentials, salary adjustments according to plan and step-ups or increments for employees of the city and employees of covered organizations which have taken effect since June thirtieth, nineteen hundred seventy-five or which will take effect after that date pursuant to collective bargaining agreements or other analogous contracts requiring such increased payments as of July first, nineteen hundred seventy-five as of any date thereafter are hereby, in the same manner, suspended. For the purposes of computing the pension base of retirement allowances, the suspended salary or wage increases and the suspended other payments shall not be considered as part of compensation or final compensation or of annual *116 salary earned or earnable. The suspensions provided herein shall be effective for the first pay period ending on or subsequent to September first, nineteen hundred seventy-five and shall continue until one year thereafter and, to the extent of any determination of the board that a continuation of such suspensions, to a date specified by the board, is necessary in order to achieve the objectives of the financial plan, such suspensions shall be continued to the date specified by such board, which date shall in no event be later than the end of the emergency period.
"2. This section shall not be applicable to employees of the city or employees of a covered organization covered by a collective bargaining agreement or an employee of the city or a covered organization not covered by a collective bargaining agreement where the collective bargaining representative or such unrepresented employee has agreed to a deferment of salary or wage increase, by an instrument in writing which has been certified by the mayor on or before September first, nineteen hundred seventy-five, or certified by the board after September first, nineteen hundred seventy-five as being an acceptable and appropriate contribution toward alleviating the fiscal crisis of the city. The board may, if it finds that the fiscal crisis has been sufficiently alleviated or for any other appropriate reason, direct that the suspensions of salary or wage increases or suspensions of other increased payments shall, in whole or in part, be terminated.”

. The pertinent provisions of FEA are set forth in the Appendix.

. By order of the Appellate Division and on consent of the parties, the Attorney-General was permitted to intervene to defend the constitutionality of the challenged statute on the appeal in that court.

. Included among the findings on which the enactment of FEA was based were the following:
"The city is unable to obtain the funds needed by the city to continue to provide essential services to its inhabitants or to meet its obligations to the holders of outstanding securities. Unless such funds are obtained the city will soon (i) fail to pay salaries and wages to employees and amounts owed vendors and suppliers to the city, (ii) fail to pay amounts due to persons receiving assistance from the city and (iii) default on the interest and principal payments due the holders of outstanding obligations of the city.
"If such failures and defaults were to occur, the effect on the city and its inhabitants would be devastating: (1) unpaid employees might refuse to work; (2) unpaid vendors and suppliers might refuse to sell their goods and render services to the city; (3) unpaid recipients of public assistance would be unable to provide themselves with the basic necessities of life; and (4) unpaid holders of city obligations would seek judicial enforcement of their legal rights as to city revenues. These events would effectively force the city to stop operating as a viable governmental entity and create a clear and present danger to the health, safety and welfare of its inhabitants.” (L 1975, ch 868, § 1.)

. Other organizations, the employees of which were made subject to the wage freeze, included the Board of Education of the City of New York, the Board of Higher Education of the City of New York, the Health and Hospitals Corporation, the New York City Housing Authority, the New York City Housing Development Corporation, City University Construction Fund, Battery Park City Authority, New York City Convention and Exhibition Center Corporation, Manhattan and Bronx Surface Transit Operating Authority, Staten Island Rapid Transit Operating Authority, the New York City Sports Authority and the Brooklyn Sports Authority.