[Civ. No. 9050. Third Dist. Nov. 1, 1956.]

SACRAMENTO MUNICIPAL UTILITY DISTRICT, Petitioner, v. JOSEPH E. SPINK, as Secretary, etc., Respondent.

*Assigned by Chairman of Judicial Council.

Frank L. Sprague, McDonough & Wahrhaftig, Downey, Brand, Seymour & Rohwer and Orrick, Dahlquist, Herrington & Sutcliffe for Petitioner.

Brandenburger, White & Dillon for Respondent.

SCHOTTKY, J.—This is an original proceeding instituted by the Sacramento Municipal Utility District to compel Joseph E. Spink, as secretary of the Sacramento Municipal Utility District, to sign and execute some $85,000,000 worth of bonds which were authorized by the electors of the district.

The Sacramento Municipal Utility District was organized in July of 1923 under the provisions of the Municipal Utility District Act (now Pub. Util. Code, div. 6, § 11501 et seq.). The district serves a population in excess of 300,000 and comprises an area of approximately 650 square miles in Sacramento and Placer Counties. The district has owned and operated an electric distribution system for over eight years. The district has been purchasing power from the United States Bureau of Reclamation. It does not have any facilities for generating electric power. In 1955 the Legislature added certain provisions to the Public Utilities Code which permit a municipal utility district which has owned and operated an electric distribution system for at least eight years and which has a population in excess of 250,000 to issue revenue bonds for the purpose of financing the construction of hydroelectric facilities and associated transmission facilities required to deliver the power and energy generated to the distribution system. (Stats. 1955, ch. 1268, § 1; Pub. Util. Code, §§ 12850-12852.)

Acting under the authority granted by these statutes, the district called an election at which the electorate was asked to authorize the issuance of some $85,000,000 worth of revenue bonds to be issued under the provisions of the Revenue Bond Law of 1941 for the purpose of developing hydroelectric generating facilities on the American River in El Dorado County. The project known as the Upper American River Project will provide for the generating of electricity and the construction of transmission lines to carry the electricity generated to the present distribution system. The bond issue was approved by the voters of the district. Thereafter,

the board of directors adopted a resolution authorizing the issuance of the revenue bonds.

The proposed bonds are to be secured by a lien upon the gross revenue of the district including the revenues of the existing distribution system after the maintenance and operating costs are paid. The proposed bonds will not be a general obligation debt of the district; the purchasers of the bonds cannot compel the exercise of the taxing power of the district or the forfeiture of any of its property.

At the present time the district has an indebtedness of $21,270,000, including some $10,317,000 worth of bonds issued in 1938. These bonds were issued under the provisions of the Municipal Utility District Act of 1921 as amended (Stats. 1921, ch. 218; Stats. 1929, ch. 31; Stats. 1931, ch. 75, § 18), which at the time the bonds were authorized provided:

"Only revenue producing utilities shall be acquired, owned or operated by a district formed under the provisions of this act. The rates and charges for commodities or service furnished shall be fixed by the board of directors. As far as possible utilities shall be self-supporting but in order so to do the board shall not be required to fix a rate which in its opinion is unreasonably high, nor to cover large expenditures and the interest thereon required for future needs and development.

"The words 'revenue producing utilities' as used in this act, shall be deemed to mean such utilities as those from which revenue is customarily or may be derived by means of charges, rates, or rentals imposed upon or collected from users, consumers or customers thereof, together with such works, facilities and appliances used or useful in connection therewith or incidental thereto."

Section 20 read:

"(1) If, in the opinion of the board of directors, the revenues will not be sufficient to pay the principal or interest on any bonded debt as it becomes due, or to carry out the objects and purposes of the district, then said board shall levy a tax for such purpose or purposes and fix the amount of money necessary to be raised therefor by taxation."

Included in the covenants of the 1938 bonds is the following: "The full faith and credit of said District are hereby pledged for the punctual payment of the principal and interest of this bond."

Respondent Joseph E. Spink as secretary of the Sacramento Municipal Utility District has refused to execute the

proposed bonds because as he alleges they do not meet the requirements of law.

Mandamus is, of course, an appropriate remedy to compel respondent to sign the bonds if the proposed issue meets the requirements of the law, since the acts demanded are ministerial duties (*City of Oxnard* v. *Dale*, 45 Cal.2d 729 [290 P.2d 859]; *City of Fairfield* v. *Hutcheon*, 33 Cal. 2d 475 [202 P.2d 745]; *California Toll Bridge Authority* v. *Kelly*, 218 Cal. 7 [21 P.2d 425]; *Fairfield-Suisun Sewer Dist.* v. *Hutcheon*, 139 Cal.App.2d 502 [294 P.2d 102]), and original jurisdiction has frequently been exercised by the appellate courts in proper cases of this nature. (*City of Grass Valley* v. *Walkinshaw*, 34 Cal.2d 595 [212 P.2d 894]; *Ventura County Harbor Dist.* v. *Board of Supervisors*, 211 Cal. 271 [295 P. 6]; *Fairfield-Suisun Sewer Dist.* v. *Hutcheon*, *supra*.)

Respondent's first contention is that sections 12850-12852 of the Public Utilities Code are in contravention of the Constitution of the State of California because they constitute a violation of the mandate of article IV, section 25, subdivision 33, that the Legislature shall not pass any local or special laws where a general law can be made applicable. Respondent claims that the law is special because it only applies to districts which have owned and operated an electric distribution system for over eight years and have a population of over 250,000. (Pub. Util. Code, § 12850.) The law is not special in the sense that it refers to the Sacramento Municipal Utility District. A law to be general in its scope need not include all classes. An act which applies uniformly to any single class in its entirety when the class is founded upon some natural intrinsic or constitutional classification is not special legislation. (*In re Sutter-Butte By-Pass Assessment No. 6*, 191 Cal. 650, 671 [218 P. 27].)

As was said in *Sacramento Municipal Util. Dist.* v. *Pacific Gas & Elec. Co.*, 20 Cal.2d 684, at page 693 [128 P.2d 529]:

". . . None of those constitutional principles is violated if the classification of persons or things affected by the legislation is not arbitrary and is based upon some difference in the classes having a substantial relation to the purpose for which the legislation was designed. (*County of San Bernardino* v. *Way*, 18 Cal.2d 647 [117 P.2d 354]; *Powers Farms* v. *Consolidated Irr. Dist.*, 19 Cal.2d 123 [119 P.2d 717].) A law to be general in its scope need not include all classes of individuals in the state. Nor is a classification void because it does not embrace within it every other class which

might be included. (*Heron* v. *Riley,* 209 Cal. 507 [289 P. 160]; *Powers Farms* v. *Consolidated Irr. Dist., supra.*) Wide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. (*In re Weisberg,* 215 Cal. 624 [12 P.2d 446]; *Rainey* v. *Michel,* 6 Cal.2d 259 [57 P.2d 932, 105 A.L.R. 148]; *Gillum* v. *Johnson,* 7 Cal.2d 744 [62 P.2d 1037, 63 P.2d 810, 108 A.L.R. 595]; *Natural Milk etc. Assn.* v. *City etc. of S. F., ante,* p. 101 [124 P.2d 25].) A distinction in legislation is not arbitrary if any set of facts reasonably can be conceived that would sustain it."

 In the instant case it cannot be held that the classification "is palpably arbitrary and beyond rational doubt erroneous." The statute permits only utility districts which have operated an electric distribution system for eight years and which have a population in excess of 250,000 to issue bonds in accordance with the provisions of the Revenue Bond Law of 1941 for the purpose of constructing hydroelectric generation facilities and associated transmission facilities required to deliver the power and energy generated by such facilities to "load center." It is common knowledge that such facilities are expensive. It is reasonable to assume that only populous districts could assure the necessary revenues to finance the cost of such projects. The fact that the Legislature limited the application of the statute to districts which have owned and operated a distribution system for eight years may have been due to a determination that a district should have experience in the distribution of electric power before it was allowed to integrate its system or it may have been due to a determination that the electorate should have a chance to judge the operation of the system before large expenditures for the development of hydroelectric facilities be incurred.

 Respondent next attacks the validity of the legislation upon the ground that the subject of the act is not expressed in its title. The legislation was added by Statutes of 1955, chapter 1268, under the following title: "An act to add Article 6a, comprising Sections 12850 to 12852, inclusive, to Chapter 6 of Division 6 of the Public Utilities Code, relating to municipal utility districts." Article IV, section 24, of the Constitution of the State of California provides: "Every act

shall embrace but one subject, which subject shall be expressed in its title. But if any subject shall be embraced in an act which shall not be expressed in its title, such act shall be void only as to so much thereof as shall not be expressed in its title." It cannot be doubted that the sections relate to municipal utility districts. Respondent's objection is that the title did not refer to the fact it related to only certain municipal districts and that no reference was made to the fact that the statutes permitted certain utility districts to finance construction by bonds issued under the provisions of the Revenue Bond Law of 1941. In *County of Los Angeles* v. *Hurlbut*, 44 Cal.App.2d 88, the court stated at pages 100-101 [111 P.2d 963]:

"It is not necessary that the title of an act should embrace an abstract or catalogue of its contents. (*Abeel* v. *Clark*, 84 Cal. 226, 229 [24 P. 383].) So long as the provisions of a statute are germane to the subject matter of the title, no violence is done to the Constitution in omitting from the title an index of all such provisions. (*Ex parte Hallawell*, 155 Cal. 112, 114 [99 P. 490].) Every provision of an act which is closely allied to the subject expressed in the title is germane to it. (*Utah State Fair Assn.* v. *Green*, 68 Utah 251 [249 P. 1016].) The purpose of the constitutional provision is merely to prevent legislators of the public from being misled by titles to bills whereby legislation relating to one subject might be obtained under the title of another subject. (*Abeel* v. *Clark, supra.*)"

In *Ikuta* v. *Ikuta*, 97 Cal.App.2d 787, the court said at page 791 [218 P.2d 854]:

"A title will not be held objectionable merely because it is general in terms, or is broader in scope than the provisions of the act, as long as those provisions are germane to the subject. . . ."

The title to the act in question certainly deals with municipal utility districts. The act is a short one and states in the title that it adds a new article, 6a, to the act relating to municipal utility districts, and at the outset the act states that it applies only to districts which have owned and operated an electric distribution system for at least eight years and have a population of 250,000 or more. Neither the public nor the Legislature could have been misled by the fact that no reference is made in the title to the fact that certain municipal utility districts are empowered to issue bonds under the provisions of the Revenue Bond Law of 1941.

The title is general but generality is not an objection so long as the provisions of the act are germane to the subject of the act, and in this case we are satisfied that respondent's contention that the legislation is invalid because the subject of the act is not expressed in the title cannot be sustained.

Respondent next contends that the terms of the contemplated revenue bonds constitute an impairment of the contract with the holders of the bonds issued by the district in 1938, which bonds are still outstanding. Respondent argues that the revenues out of which it is proposed to service the revenue bonds will include all of the revenues derived by the district from the operation of its electrical system exclusive of moneys derived from the levy or collection of taxes; that these revenues will include those derived from the present distribution system; that at the present time the revenues from the distribution system are being used to service the outstanding bonds; that if the holders of the bonds issued in 1938 have a lien on these revenues, the diversion of the revenues would impair the obligation of the contract they made with the District.

When the 1938 bonds were issued the Municipal Utility District Act contained a provision that:

"Only revenue producing utilities shall be acquired, owned or operated by a district formed under the provisions of this act. The rates and charges for commodities or service furnished shall be fixed by the board of directors. As far as possible utilities shall be self-supporting but in order so to do the board shall not be required to fix a rate which in its opinion is unreasonably high, nor to cover large expenditures and the interest thereon required for future needs and development.

"The words 'revenue producing utilities' as used in this act, shall be deemed to mean such utilities as those from which revenue is customarily or may be derived by means of charges, rates or rentals imposed upon or collected from users, consumers or customers thereof, together with such works, facilities and appliances used or useful in connection therewith or incidental thereto." (Stats. 1921, ch. 218, as amended Stats. 1931, ch. 75, § 18.)

The section as it read did not compel the district to allocate any of the revenue received to the payment of the bonds. It contains a guide for the directors to follow. The section specifically provides that large expenditures and the interest thereon which was required for future development could be

paid by means other than revenues. Nothing affirmatively appears in the section which compels the conclusion that the directors pledged the revenue or were under an obligation to the bondholders of the 1938 bonds to use the revenues from the distribution system to pay its indebtedness to the bondholders. In our opinion a bond which contains a general obligation to pay does not contain an implied promise to pay out of a particular fund except in a clear case. (See 15 McQuillin, Municipal Corporations (3d ed.), p. 692.)

In *City of Oxnard* v. *Dale*, 45 Cal.2d 729, the court said at page 737 [290 P.2d 859]:

"It follows that, in the present case, the former practice of the city to use the revenues from the sewer system to make payments on the general obligation bonds has no bearing upon the question whether the incurring of a subsequent obligation to be paid solely from those revenues, in priority to the general bonds, will violate section 18 of article XI. It may be noted, in this connection, that in the absence of some specific statutory or contractual provision the city could properly reduce or discontinue the imposition of charges for use of its sewer system and arrange for the assessment of taxes to make the payments on its general bonds. Since the city may terminate use of sewer revenues as a means of servicing the general bonds, it is, of course, immaterial that the city, at the same time, pledges the revenues for the payments to be made on an issue of revenue bonds.

"As we have seen, an obligation which is payable out of a special fund is not an 'indebtedness or liability' of a governmental body within the meaning of section 18 of article XI of the Constitution if the governmental body is not required to pay the obligation from its general funds, or by exercise of its powers of taxation, should the special fund prove insufficient."

 It is clear from the foregoing quotation that if the revenues were not specifically pledged the contract entered into between the 1938 bondholders and the district is not impaired if the district diverts those revenues to secure a revenue bond issue.

Included in the covenants of the 1938 bonds is the following: "The full faith and credit of said District are hereby pledged for the punctual payment of the principal and interest of this bond." Respondent contends that this clause should be interpreted to mean that the revenues of the district are pledged as security for the bonds. We cannot agree that

the phrase "full faith and credit" pledged the revenues of the District to the payment of the bonds. Our research has disclosed only one jurisdiction where the meaning of such phrase has been determined. The Supreme Court of Florida, in *State* v. *City of Lakeland*, 154 Fla. 137 [16 So.2d 924], has held that it cannot agree that the phrase "full faith and credit" pledged the revenues of the district in payment of the bonds; that in its view the pledge contained in the original obligations no more constitutes an express pledge of the revenues in the legal sense of the term, than it does other income of the district; that it does no more than express an undertaking by the city to be irrevocably obligated in good faith to use its taxing powers as may be required for the full and prompt payment of the principal and interest as it becomes due. We agree with the interpretation of the Florida court and hold that such a covenant does not pledge the revenues.

Respondent next contends that the petitioner district has no authority to use revenue from its existing facilities with which to discharge revenue bonds which are to be issued. Respondent first relies on section 54310 of the Government Code which forbids a local agency from issuing revenue bonds for the generation, production, transmission, and distribution of electric energy. However, section 12851 of the Public Utilities Code grants the authority and specifically states that said section 54310 insofar as it is inconsistent with section 12851 shall not apply. Respondent next argues that the existing system is one enterprise and the proposed project is another and that it is only from the latter that revenues may be derived with which to satisfy the revenue bond issue. Section 12851 of the Public Utilities Code states:

"A district may . . . issue bonds in accordance with the Revenue Bond Law of 1941 . . . for the purpose of financing the construction of hydroelectric generation facilities and associated transmission facilities required to deliver the power and energy generated by such hydroelectric generation facilities to load center, which shall constitute an 'enterprise' within the meaning of Section 54309 of the Government Code."

The section defines an "enterprise" within the meaning of the Government Code, section 54309, so that revenue bonds can be issued. To construe it so as to limit the revenues of

the District which can be pledged to those derived from the facilities constructed would in our opinion defeat the very purpose of the act under which the bonds here under attack were authorized. The statute only applies to existing districts which have owned and operated an electric distribution system for eight years and which have a population in excess of 250,000. It permits those districts to construct hydroelectric generating facilities and facilities for the transmission of the power generated to "load center" (or to the distribution system). If the power is to be used by the district and if the revenues are received from the ultimate consumers and the revenues received from the consumers are confined to the distribution enterprise there can be no revenues from the generating and transmission facilities unless the Legislature were to provide some method of allocation. Even if the generation of its own power provided savings in the costs of operation to the district the increased "profits" would still be attributable to the distribution system because that in a practical sense is the only place from which revenues are derived. The more reasonable construction is that the Legislature intended the revenues from the entire integrated system (and this is really what the new facilities provide), to be available for the servicing of the revenue bonds. The fact that the Legislature defined an enterprise for the purpose of bringing it within the provisions of the Revenue Bond Law of 1941 which provide what facilities may be financed by revenue bonds does not necessarily mean that such enterprise must be construed as an enterprise for the purpose of determining what revenues are available to service such bonds. But even if the proposed facilities and the existing distribution system are two separate enterprises, the revenues of the distribution system may be pledged. Section 54420 of the Government Code provides that the bonds (revenue bonds) are special obligations and are secured by the gross revenues of the enterprise and such funds as are described in the resolution authorizing the issuance of the bonds. (See also sections 54384, 54421, 54422, and 54478, subd. (b).) The resolution calling for the issuance of the bonds did provide that the bonds were to be secured by all the revenues of the District as it exists and as it will be improved and extended by the facilities of the American River Project. The statutes authorize the pledging of the revenue from the distribution enterprise to the servicing of the proposed bonds. This was done. Therefore, such revenues can be used.

Respondent's next contention is that the district has not acquired and cannot acquire the water rights necessary for the purpose of enabling it to generate hydroelectric power through the proposed works to be constructed as part of the Upper American River Project. Respondent asserts there are no surplus waters of the American River that will be available to the district, and that, therefore, when the voters of the district voted for the issuance of the revenue bonds for the purpose of acquiring all water rights necessary for the contemplated project the measure passed by them was invalid ''because it provides for the performance of a legal impossibility.''

We deem it unnecessary to discuss the question of whether or not water rights will be available for the project as that is not a matter for this court to pass upon in this proceeding. We may safely assume that the district will not proceed with the construction of works for the generation of electric power until the necessary water rights are' assured. We cannot say as a matter of law that the district will not be able to acquire the necessary water rights for the operation of the project.

Respondent contends also that the district does not have authority to submit itself to the taxing power of El Dorado County. It is, of course, true that El Dorado may tax lands and improvements which exist at the time that the district acquires the necessary property in El Dorado County. (Cal. Const., art. XIII, § 1.) Respondent contends that El Dorado County might impose taxes which would exceed the annual income of the district and thus the debt limitation imposed upon the district by section 12841 of the Public Utilities Code would be exceeded.

There can be no doubt that the district has the power to pay any taxes levied upon property acquired by it in El Dorado County. (Pub. Util. Code, §§ 11884, 11891, 12721.) Furthermore, by acquiring property in El Dorado County petitioner district will not thereby incur an indebtedness in any sense of the word. For that matter, even future taxes that might later be levied against property in El Dorado County would not constitute an indebtedness within the meaning of section 12841, as they would not be a voluntary obligation, but an obligation imposed by law. In construing the similar debt limitation of article XI, section 18, of the California Constitution, it has been held many times that an obligation imposed by law does not come within the

limitations of that section. See *Long Beach* v. *Lisenby*, 180 Cal. 52 [179 P. 198]; *County of Los Angeles* v. *Byram*, 36 Cal.2d 694 [227 P.2d 4]; and 18 California Jurisprudence., Municipal Corporations, section 178, page 822. The district has the power to increase its revenues to meet any increase in costs by an increase in its rates (Pub. Util. Code, § 12809) or by a levy of taxes (Pub. Util. Code, § 12892).

Respondent next contends that the cost of the project has been greatly underestimated and the authorized revenue bonds will be insufficient to complete it. It is at once apparent that this contention, like the preceding contentions as to water rights and fear of the taxing power of El Dorado County, is not one that goes to the validity of the bonds, but rather to the wisdom of the project. What this court said in *Robbins* v. *Sonoma County Flood etc. Dist.*, 138 Cal.App.2d 291, at page 302 [292 P.2d 52], is applicable to these contentions.

". . . It is argued that there is and can be no assurance that the estimated cost of the work will bear any reasonable relation to actual costs and that already the costs, as estimated and alleged by plaintiffs, have increased most materially over the estimates made by the public agencies involved. That also may be assumed to be true. But such considerations are not material here nor do they, nor can they, affect the legality of the bonds proposed to be issued and sold. The possibility of such mischances may well have been valid arguments to the voters to persuade them not to authorize the district to incur the proposed indebtedness, and it may well be that they were urged upon all by those who opposed the debt. They are not, however, material here where the attack is upon the validity of what has been and what is proposed to be done and not upon the advisability thereof."

 Respondent's final contention is that the district is not authorized to pledge all of the income received from the distribution and sale of electric power to the payment of the revenue bonds, and cites section 12809 of the Public Utilities Code which provides: "The rates charged for commodities or services furnished shall be fixed by the board. As far as possible public utilities shall be self supporting but the board is not required to fix a rate which in its opinion is unreasonably high nor to cover by rates large expenditures and the interest thereon required for future needs and development." Respondent contends that the intent of the final sentence is that large expenditures for future needs and development

should be covered by current revenues only where necessity requires and that where such necessity does not exist it is an abuse of discretion to so provide.

Section 12809 constitutes a grant of authority to the board of directors to fix the rates and charges for commodities and services furnished by the district. While it does not compel the district to pay for large expenditures for future needs from rates,it does not so forbid. To say that one is not required to do something is not to say that he is required to do its opposite. For that matter, the general rule set forth in section 12809 is that the utility should be self-supporting. Therefore, the fact that the revenue bonds are to be paid from rates does not in any way conflict with the section. Section 12809 makes no attempt to distinguish between revenue and general obligation bond financing and it cannot be construed impliedly to deprive the district from employing revenue bond financing. In fact, the subsequently enacted article 6a of the Public Utilities Code provides, in section 12851, that bonds may be issued ''in accordance with the Revenue Bond Law of 1941.'' This specifically authorizes the use of revenue bond financing, and, once the revenue bonds are issued the controlling section is 54515 of the Government Code which makes it mandatory upon the district to fix rates and charges fully sufficient to pay the interest on and principal of the revenue bonds as they become due and payable. We therefore conclude that there is no merit in respondent's contention that the district is not authorized to pledge all of its revenue to the payment of the revenue bonds.

Likewise without merit is respondent's contention that the submission of the proposition relating to the Upper American River Project was an abuse of discretion by the board of directors because, according to respondent, additional electric power could be obtained at lower cost from the Pacific Gas and Electric Company.

The district's authority to construct works for supplying electric power and energy or to purchase such power and energy from other sources is contained by implication in article 6a and directly in section 12801 of the Public Utilities Code, which provides as follows:

''A district may acquire, construct, own, operate, control. or use, within or without, or partly within or partly without, the district, works or parts of works for supplying the inhabitants of the district and public agencies therein, or some of them, with light, water, power, heat, transportation,

telephone service, or other means of communication, or means for the collection, treatment, or disposition of garbage, sewage, or refuse matter, and may do all things necessary or convenient to the full exercise of the powers herein granted. The district may also purchase any of such commodities or services from any other utility district, public agency, person, or private company, and distribute them.''

The legislative power of the district is vested in its board of directors. (Pub. Util. Code, § 11801.) Here the board has found and determined that the public interest and necessity demand the acquisition and construction of the project and that the cost should be financed through the issuance of revenue bonds. That finding is conclusive under the rule of *In re East Bay Municipal Util. Dist. Water Bonds of 1925,* 196 Cal. 725 [239 P. 38], the headnote of which correctly states its holding:

''In a proceeding to validate a bond issue of a Municipal Utility District . . . , where the court found that the board of directors had by resolution determined that public interest and necessity demanded the same, in the absence of fraud and of attack upon said finding, the finding is conclusive that the district will be benefited by the proposed improvement.''

As was pointed out with respect to the question of whether the funds provided will be adequate to meet the cost of the project, questions of advisability of a project are for the board and the electors. Nor is there any abuse of discretion on the part of the district in constructing a hydroelectric project rather than constructing a steam electric generating plant. ■ As stated in connection with the preceding point, the decision as to whether the district should purchase its power requirements or construct its own works and, if so, the type of works, is vested in its board of directors whose determination is conclusive.

■ In view of the foregoing we conclude that the petitioner Sacramento Municipal Utility District, had the right to issue the bonds approved at the bond election, and that it is entitled to a writ of mandate directing respondent secretary, Joseph E. Spink, forthwith to sign and execute each and every bond and coupon of the issue hereinbefore referred to as provided by law and by said Resolution Number 2941 of the board of directors of petitioner district.

Let the writ issue as prayed for.

Van Dyke, P. J., and Peek, J., concurred.