**WORLD HOLDINGS, LLC, Plaintiff,**

**v.**

**FEDERAL REPUBLIC OF GERMANY, Defendant.**

**Case No. 08–20198–CIV.**

United States District Court, S.D. Florida, Miami Division.

Aug. 22, 2011.

Michael E. Elsner, Brian T. Frutig, John M. Eubanks, Vincent I. Parrett, Motley Rice LLC, Mt. Pleasant, SC, Samuel Johnathan Dubbin, Dubbin & Kravetz LLP, Coral Gables, FL, Ingrid L. Moll, Motley Rice LLC, Hartford, CT, William F. Pepper, New York, NY, for Plaintiff.

Gerald J. Houlihan, Houlihan & Partners PA, Miami, FL, Jeffrey Harris, Max Riederer Von Paar, Rubin Winston Diercks Harris & Cooke LLP, Washington, DC, for Defendant.

### ORDER

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** came before the Court for a hearing on February 15, 2011 [ECF No. 255] on Defendant, Federal Republic of Germany's ("Germany['s]") Motion for Summary Judgment ... [ECF No. 208], filed on July 15, 2011. The Court has carefully considered the parties' written submissions, arguments, and the applicable law.

## I. BACKGROUND

Following World War I ("WWI") and in need of capital, Germany issued various bearer bonds. *See World Holdings, LLC v. Fed. Rep. of Ger.*, 794 F.Supp.2d 1305, 1308–09, No. 08–20198–CIV, 2011 WL 2217495, at *1 (S.D.Fla. June 5, 2011). In 1924, Germany "offered for subscription in the United States $110 million worth of bearer bonds known as Dawes Bonds...." *Id.* Six years later, in 1930, "Germany offered for subscription in the United States $98.25 million of a second bearer bond, the Young Bonds...." *Id.*

World Holdings "owns or controls"[1] 136 validated[2] Dawes and Young Bonds (the "Bonds"). (Def.'s Statement of Undisputed Material Facts ("SMF") ¶¶ 1–3 [ECF No. 208–1] ). Of World Holdings's Bonds, 92 are Dawes, and 44 are Young. (*See id.* ¶ 4). The Dawes Bonds matured on October 15, 1949.[3] (*See id.* ¶ 13). World Holdings (or its predecessors in interest) validated these 92 Dawes Bonds by July 15, 1964. (*See id.* ¶ 14). The Young Bonds matured on June 1, 1965. (*See id.* ¶ 17). World Holdings (or its predecessors in interest) validated these 44 Young Bonds by June 14, 1960. (*See id.* ¶ 16). Despite having validated the bonds, neither World

1. Germany disputes that World Holdings "owns or controls" a majority of these bonds. (Def.'s Proposed Findings of Facts and Conclusions of Law ¶¶ B(20)-(32) [ECF No. 211] ). For purposes of this Motion, the Court need not decide the issue.

2. The validation requirement is discussed in detail in the Court's earlier summary judg-

ment order. *See generally World Holdings,* 794 F.Supp.2d 1305, 2011 WL 2217495.

3. World Holdings does not dispute the dates the Dawes and Young Bonds matured or the dates they were validated. (*Compare* SMF ¶¶ 13–17, *with* Pl.'s Statement of Undisputed Facts in Opposition ... ("SMFO") ¶¶ 13–17 [215–1] ).

Holdings nor its predecessors in interest accepted the settlement offer negotiated in 1953 in the London Debt Agreement. (*See id.* ¶ 7); Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, T.I.A.S. No. 2792, 1953 WL 44333 (1953) (hereinafter "London Debt Agreement" or "LDA"). And Germany never paid on World Holdings's bonds. (*See* SMFO ¶¶ 34–35).

The Court presumes the parties' familiarity with the remaining facts, which are addressed in the earlier summary judgment order. *See World Holdings*, 794 F.Supp.2d at 1308–12, 2011 WL 2217495, at *1–4.

## II. LEGAL STANDARD

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir.1990).

## III. ANALYSIS

### A. The Statute of Limitations Began to Run on All Bonds by June 1, 1965.

██ "The general rule in New York [4] is that the Statute of Limitations commences to run when the cause of action accrues, even though the plaintiff is un-

aware that he or she has a cause of action." *Gower v. Weinberg*, 184 A.D.2d 844, 845, 584 N.Y.S.2d 496 (3d Dep't 1992) (citations omitted); *see also* N.Y. C.P.L.R. § 203(a) (MCKINNEY 2011) ("The time within which an action must be commenced, except as otherwise expressly prescribed, shall be computed from the time the cause of action accrued to the time the claim is interposed."). "An action accrues, then, when all of the facts necessary to sustain the cause of action have occurred, so that a party could obtain relief in court." *Vigilant Ins. Co. of Am. v. Hous. Auth. of El Paso, Tex.*, 87 N.Y.2d 36, 637 N.Y.S.2d 342, 660 N.E.2d 1121, 1125 (1995). Normally, the statute of limitations "will only begin to run on the day after maturity of the bonds...." *Id.* Here, the Dawes and Young Bonds provided specific dates on which payment—interest or principal—would be paid. (*See* Dawes Bond 1 [ECF No. 221] ("The German Reich ... hereby promises to pay on the 15th day of October 1949 ... the principal sum ..., and to pay semi-annually on the 15th day of April and the 15th day of October ... interest thereon ..., in accordance with the coupons for such interest hereto attached...."); Young Bond ¶¶ V, X [ECF No. 221] ("All the bonds shall bear interest ... payable by equal half-yearly payments on the first day of June and first day of December each year.... Any portion of the Loan then outstanding shall be redeemed (with accrued interest) on the first day of June One thousand nine hundred and sixty-five.")). Because the Bonds provided specific dates on which payment was due, when Germany failed to pay on those dates, a cause of action accrued. *See Vigilant Ins. Co. of Am.*, 637 N.Y.S.2d 342, 660 N.E.2d at 1125.

While normally the statute of limitations on a suit for payment on a bond will begin

---

4. The parties agree that New York law applies. (*See* SMF ¶ 9).

to run the day after the bond's maturity, in this case it is not so easy. Here, the Bonds' terms were interrupted by the rise of the Nazis, World War II ("WWII"), the fall of the Nazis, post-WWII treaties,[5] the Cold War, and Germany's subsequent reunification.

Germany contends the statute of limitations began to run in this case on the later date of either when the Bonds matured or when the Bonds were validated. (*See* Mot. 8). World Holdings's Dawes Bonds were validated after maturity (which occurred on October 15, 1949), by July 15, 1964. (*See id.*; 2d Jaeger Decl. ¶ 2 [ECF No. 208–3]; SMF ¶¶ 13–14). Germany thus asserts the statute of limitations for the Dawes Bonds began to run on July 15, 1964. (*See* Mot. 8). With World Holdings's Young Bonds, these bonds were validated by June 14, 1960, before their maturity date of June 1, 1965. (*See* SMF ¶¶ 16–17). Germany thus contends that the Young Bonds' statute of limitations began to run on June 1, 1965. (*See* Mot. 8). According to Germany, then, claims for Dawes Bonds expired on July 15,1970, and

claims for Young Bonds expired on June 1,1971.[6] (*See id.*).

Despite these dates, World Holdings asserts that the LDA, by law, delayed payment on non–assenters' bonds. (*See* Mot. Opp'n 5 [ECF No. 215]). It asserts the LDA thus delayed the time whereby the non-assenting bonds "matured," and the right to sue did not accrue until the last assenting bond under the LDA was paid. (*See id.*). According to World Holdings, this occurred on October 3, 2010.[7] In support, World Holdings cites various materials.

■ The starting point is, of course, the text of the LDA itself. All of the materials cited by World Holdings either explicitly or implicitly refer to LDA Article 10.[8] LDA Article 10 reads:

> The Federal Republic of Germany will, until the discharge or extinction of all obligations under the present Agreement and the Annexes thereto, ensure that payments will not be made in respect of obligations which, while covered by paragraphs (1) and (2) of Article 4, are owed to a Government other than

---

**5.** The undersigned has taken judicial notice of four of the related measures (*see* [ECF No. 79]): (1) the Validation Law of August 25, 1952 ("Validation Law"); (2) the Agreement on Validation Procedures of February 27, 1953 ("Validation Treaty"); (3) the Second Implementing Ordinance of March 13, 1953; and (4) the Treaty of April 1, 1953 ("1953 Treaty").

**6.** Although Germany calculates these dates using the New York six-year statute of limitations, even if the 20–year statute of limitations applied, the claims would be time-barred.

**7.** If October 3, 2010 was the date for the accrual of World Holdings's claims on the validated bonds, this case would present a ripeness issue. This suit was filed on January 23, 2008. That is over two years before World Holdings asserts payment on the bonds was due. World Holdings could not, of course, sue for breach of contract (for non-

payment) before maturity. That claim would not be ripe. World Holdings concedes as much. (*See* Summ. J. Hr'g 16:12–15, Aug. 15, 2011 (citations to the hearing transcript are to the unofficial transcript)). At this point, however, the case would be ripe as payment would have been due in 2010 and clearly, as this case has demonstrated, payment was not timely made. *See Henley v. Herring*, 779 F.2d 1553, 1555 (11th Cir.1986) (not dismissing a case where although not ripe at filing, the case had ripened when the district court ruled).

**8.** Some of the materials discuss prior versions of Article 10. (*See* Summ. J. Hr'g 13:20–23). The parties cannot rely on draft versions of the LDA where the explicit language of the final signed, ratified, and proclaimed version directly contradicts the draft.

that of a creditor country or to any person not residing in or a national of a creditor country and which are or were payable in a non-German currency. This provision does not apply to debts arising from marketable securities payable in a creditor country.

LDA Art. 10, at 450–51. The last line of Article 10, that "[t]his provision does not apply to debts arising from marketable securities payable in a creditor country," prevents application of Article 10 to creditors such as World Holdings—which owns Dawes and Young Bonds (marketable securities) payable in the United States (a creditor country). Therefore, LDA Article 10 cannot be World Holdings's basis of authority for extending the payments' due date.

World Holdings also highlights a *New York Times* article from 1958 which, in discussing the LDA, stated that

> such legislation stipulated that no payments could be made to non–assentees until settlements arrived at under the London agreement had been completed. In some circles, this commitment of Germany has been taken to mean that non-assentees must wait for payment at the original contractual debt rate until all bonds extended under the London settlement formula had been paid off.... The non-assenting bondholder must therefore decide ... whether the bird in the hand is worth two in the bush.

(Paul Heffernan, N.Y. TIMES, *Old German Bonds Offer Financial Dilemma,* Oct. 27, 1958, at 41, Mot. Opp'n Ex. D

[ECF No. 215–3] ); (*see also* Mot. Opp'n 5–6). Contrary to Mr. Heffernan's remarks, there is no such legislation that applies to World Holdings's bonds.

In addition, World Holdings cites Meeting Minutes of the Agreement on German Foreign Debts dated February 27, 1953. (*See* Informelle Bespruchengen zum Abkommen über deutsche Auslandsschulden vom 27. Februar 1953 (hereinafter "Meeting Minutes I"), Notice of Supp. Auth. Ex. B [ECF No. 190–2] ).[9] World Holdings, however, highlights Minutes referring to LDA Article 10. (*See* Mot. Opp'n 6–7) (quoting Meeting Minutes I, at 17–19; Protokolle zum Abkommen über deutsche Auslandsschulden vom 27. Februar 1953 (hereinafter "Meeting Minutes II"), Mot. Opp'n Ex. E, at 86–87 [ECF Nos. 215–3— 215–13] ). As discussed, however, Article 10 as adopted does not apply to World Holdings. See LDA Art. 10, at 450–51 (stating Article 10 "does not apply to debts arising from marketable securities payable in a creditor country").

Next, World Holdings submits the memoir of Dr. Hermann J. Abs, a German signatory of the LDA. (*See* Hermann J. Abs, Entscheidungen: 1949–1953; Die Entstehung des Londoner Schuldenabkommens, (v. Hase & Koehler 1991), Mot. Opp'n Ex. F [ECF No. 215–14] ). Dr. Abs stated

> The [LDA] was a framework agreement, and the individual settlements did not become valid until the offer by the debtor and acceptance by the creditor. Now

---

**9.** When negotiating the LDA, it was understood that the Meeting Minutes "would constitute an official document" to interpret the Treaty. (Meeting Minutes I, at 20). The delegates understood the "well recognized rule of international law that, in any disputes regarding the interpretation of an agreement, the Minutes of meetings ... were always admissible in order to establish the intention...." (*Id.* at 21).

World Holdings asserts there is a dispute as to the meaning of LDA Article 10. (*See* Summ. J. Hr'g 14:11–15:7). The actual language of Article 10, as ratified, is clear. Because there is no dispute as to the meaning of Article 10, the Court need not resort to the Meeting Minutes to determine the framers' intentions.

it was possible that a debtor would not make an offer, but was then forced to give one by the creditor, for example, by a court ruling. Conversely, it was possible that an offer by a debtor would not be accepted by the creditor. He could not be forced to accept it. However, the Agreement stipulated that the claim by a creditor who did not do so, would not be satisfied until all other settled debts had been paid. In the case of bonds, the settlement offer was deemed to have been accepted when the old adjusted debentures and interest coupons were submitted to the issuer, in order either to be exchanged for new units or to be correspondingly labeled by an imprint. (*Id.* at 219). The problem with this statement is it is factually incorrect. As finalized, the LDA did *not* stipulate that claims by non-assenters would not be satisfied until all LDA assenters had been paid. *See* LDA Art. 10, at 450–51. Explicitly, LDA Article 10 does not apply to World Holdings. *See id.*

Additionally, World Holdings points to the Court's earlier summary judgment order in this case, where the Court stated that "[o]nce validated, a bondholder [ ] had two options: (1) accept the LDA and less money, but be guaranteed payment; or (2) seek full payment but wait in line behind all LDA assenters with no guarantee of payment." *World Holdings,* 794 F.Supp.2d at 1331, 2011 WL 2217495, at *23. As the Court explains below, this statement, while true, does not support World Holdings's position.

In the end, what World Holdings has not—and could not—present is any statute, law, or treaty that tolled the statute of limitations or delayed the payment dates on these Bonds. It is not LDA Article 10; the Bonds are marketable securities which are payable in the United States—a creditor country. (*Id.*). And World Holdings points to no other provision of the LDA, or

the myriad of other treaties signed in the same relative period of time, to support its contention that its bonds were subordinated by law.

What World Holdings is left with is Germany's decision not to pay on certain bonds in favor of others. As Germany noted at oral argument, this was simply a policy decision. (*See* Summ. J. Hr'g 28:2–11, 37:1–13). It was true, as the Court noted in the earlier Order, that "[o]nce validated, a bondholder [ ] had two options: (1) accept the LDA and less money, but be guaranteed payment; or (2) seek full payment but wait in line behind all LDA assenters with no guarantee of payment." *World Holdings,* 794 F.Supp.2d at 1331, 2011 WL 2217495, at *23; (*see also* Mot. Dismiss Hr'g 45:23–46:3 Apr. 6, 2008, Mot. Opp'n Ex. G [ECF No. 215–15] ) (noting that LDA assenters were paid first). That choice, however, was not predicated on any law; it was Germany's decision based upon the limited pool of resources it possessed following its defeat in WWII. In essence, Germany said "in order to pay off those bondholders who accepted the LDA, I will breach my obligations to non-assenting bondholders." That determination, to favor and pay one creditor to the detriment of another, does not extend the statute-of-limitations period; it was a breach of Germany's legal obligations that required some legal action by the spurned bondholder.

■ Because there is no basis of authority—be it a statute, a treaty, or otherwise—for Germany to delay its payment obligations on the bonds, there is no basis to determine that the limitations period was tolled or extended to 2010, as World Holdings posits. The period for World Holdings (or its predecessors in interest) to seek payment on the bonds began running on the later of two dates—the dates the bonds matured or the dates the bonds were validated. For World Holdings's

Dawes Bonds, that clock started ticking on July 15, 1964. With World Holdings's Young Bonds, the time started running on June 1, 1965.[11] The question then becomes whether World Holdings may file a lawsuit based on claims that vested in 1964 and 1965. As the Court will explain below, it cannot.[12]

### B. The Statute of Limitations Period on the Bonds is Six Years.

■ World Holdings asserts that New York's 20–year statute of limitations should apply to this case.[13] (*See* Mot. Opp'n 10–19). For certain bond-related actions, New York extends its normal six-year statute of limitations to 20 years:

(a) On a bond. An action to recover principal or interest upon a written instrument evidencing an indebtedness of the state of New York or of any person, association or public or private corporation, originally sold by the issuer after publication of an advertisement for bids for the issue in a newspaper of general circulation and secured only by a pledge of the faith and credit of the issuer, regardless of whether a sinking fund is or may be established for its redemption, must be commenced within twenty years after the cause of action accrues. This subdivision does not apply to actions upon written instruments evidencing an indebtedness of any corporation, association or person under the jurisdiction of the public service commission, the commissioner of transportation, the interstate commerce commission, the federal communications commission, the civil aeronautics board, the federal power commission, or any other regulatory commission or board of a state or of the federal government. This subdivision applies to all causes of action, including those barred on April eighteenth, nineteen hundred fifty, by the provisions of the civil practice act then effective.

N.Y. C.P.L.R. § 211(a) (McKINNEY 2011). World Holdings maintains this section applies because Germany is a "person," and the bonds are secured only by the full faith and credit of Germany (the issuer). (Mot. Opp'n 10–19). The Court is not so convinced.[14]

---

11. At the August 16 hearing, Germany pointed out an apparent anomaly: a bondholder who timely validated his or her bonds but waited for payment has his or her claims barred, while a bondholder who did not timely validate his or her bonds but waited and had the bonds "subsequently" validated today could still have his or her claims paid. (*See* Summ. J. Hr'g 7:23–8:11); (Validation Law, Bundesgesetzblatt 1952 (BGBl.II), Art. 51, at 317 [ECF No. 46–1]). To have a bond subsequently validated, however, the bondholder must meet high standards. (*See* Validation Law, BGBl.II, Art. 51, Art. 52, at 317). Because it is difficult to have a bond subsequently validated, there is little benefit to wait to do so.

12. "Tired of lying in the sunshine staying home to watch the rain/And you are young and life is long and there is time to kill today/And then one day you find [six] years have got behind you / No one told you when to run, you missed the starting gun." Pink Floyd, Time.

13. Because the Court has determined that the claims on the Dawes and Young Bonds vested in 1964 and 1965, respectively, the Court recognizes that whether the six- or 20–year limitations period applies, World Holdings's claims are barred.

14. The Court's conclusion herein is not inconsistent with its determination in *Sovereign Bonds Exchange LLC v. Federal Republic of Germany*, No. 10–21944–CIV (S.D.Fla. Oct.20, 2010) [ECF No. 81], at 10–15. In *Sovereign Bonds*, the question of whether or not the defendant German Banks were "persons" under CPLR § 211(a) was not raised. *See id.* Further, that order concerned a motion to dismiss, not summary judgment. Finally, the Court's determination on the bonds there—which were not Dawes and Young Bonds—was based solely on the complaint's

### 1. Germany is not a "Person" Under CPLR § 211(a).

The CPLR does not define a person. *See* N.Y. C.P.L.R. § 105 (MCKINNEY 2011) (the CPLR's definitions section, not including a definition of "person"). Recently, the Southern District of New York had an opportunity to consider this statute, section 211(a), with respect to China. *See Morris v. People's Rep. of China*, 478 F.Supp.2d 561, 571 n. 15 (S.D.N.Y.2007). After determining it did not have subject-matter jurisdiction, the court noted that even if it had jurisdiction, section 21 1(a) would not apply to China. *See id.* The court interpreted the term "person" to mean "a natural person." *Id.* Finding China was "not the state of New York, a natural person, or an association or corporation," it determined section 211(a) was inapplicable. *Id.*

Instead of following *Morris,* World Holdings advocates that the Court adopt the definition of "person" found in New York's General Construction Law.[15] (*See* Mot. Opp'n 13–15). New York's General Construction Law defines a "person" as including "a corporation and a joint-stock association. When used to designate a party whose property may be the subject of any offense, the term person also includes the state, or any other state, government or country which may lawfully own property in the state." N.Y. GEN. CONSTR. LAW § 37 (MCKINNEY 2011). General Construction Law section 110 provides that "[t]his chapter is applicable to every statute unless its general object, or the context of the language construed, or other provisions of law indicate that a different meaning or application was intended from that required to be given by this chapter." *Id.* § 110. Under section 110, "[s]ection 37 is inapplicable where the general object of the [other] statute would be defeated or where 'the context of the language construed' indicates that a different meaning was intended from that given in section 37." *Ohio ex rel. Fulton v. Saal,* 239 A.D. 420, 421, 267 N.Y.S. 558 (2d Dep't 1933). This is one of the cases where the section-37 definition should not apply.

■■ Although not an "absolute" rule, statutes should be interpreted in a manner that avoids rendering language superfluous and "give[s] effect, where possible, to every word of a statute." *Duncan v. Walker,* 533 U.S. 167, 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (citing *Montclair v. Ramsdell,* 107 U.S. 147, 2 S.Ct. 391, 27 L.Ed. 431 (1883)); *see also Lamie v. U.S. Tr.,* 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). Where the choice is between (1) a clear reading of a statute where "the text is plain," albeit with some surplusage, or (2) an ambiguous reading without surplusage, courts "prefer" the plain meaning. *Lamie,* 540 U.S. at 536, 124 S.Ct. 1023. Additionally, "the general preference against surplusage is constrained by the requirement that a construction avoiding surplusage must be a reasonable one." *Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.,* 430 F.Supp.2d 222, 247 (S.D.N.Y.2006) (citing *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307–08, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)).

■ Here, there are two ways to read CPLR section 211(a). One is "person"

---

allegations; the bonds themselves and the actual language of the bonds were not presented to the Court.

**15.** This law does not refer to construction as in erecting a building. Rather, it refers to statutory construction, *see Messina v. Lufthansa German Airlines,* 64 A.D.2d 890, 891, 408 N.Y.S.2d 109 (2d Dep't 1978), and "supplies the definitions of certain statutory terms used to interpret the language and purpose of a statute." *Roslyn Union Free Sch. Dist. v. Barkan,* 16 N.Y.3d 643, 926 N.Y.S.2d 349, 352, 950 N.E.2d 85, 88 (2011).

means only a "natural person," as *Morris* found. The other is to read the General Construction Law definition of "person" into the statute, as World Holdings advocates. Section 211(a) limits its scope to "an indebtedness of the state of New York or of any person, association or public or private corporation...." N.Y. C.P.L.R. § 211(a) (McKinney 2011). If the Court "inserted" the General Construction Law "person" definition, the statute would read as follows: "an indebtedness of the state of New York or of any [corporation[,] a joint-stock association[, w]hen used to designate a party whose property may be the subject of any offense ... the state, or any other state, government or country which may lawfully own property in the state.], association or public or private corporation...." *Id.; N.Y.* Gen. Constr. Law § 37 (McKinney 2011). This combination renders the inclusion of "corporations" or "New York" superfluous in section 211(a). If the New York Legislature meant for the General Construction Law definition to apply, there would be no reason to include "corporations" and "New York" in section 211(a); "New York" and "corporations" would already be included by virtue of section 37. Further, choosing the definition that eliminates surplusage does not render the statute ambiguous. As the court in *Morris* determined, the statute is simply read as referring to *natural* persons.

Additionally, the section–37 person definition does not apply here, as the term "person" in that section only applies to other governments or countries when their "property may be the subject of any offense...." N.Y. Gen. Constr. Law § 37 (McKinney 2011). Here, it is not Germany's property that is the subject of the action or offense (breach of contract); it is

World Holdings's property.[16] World Holdings contends *it* owns or controls the 136 bonds, not Germany. (*See* SMF ¶¶ 1–3; SMFO ¶¶ 1–3; Mot. Opp'n 2). Because Germany's property is not the subject of any offense, even if section 37 did not make CPLR section 211(a)'s language superfluous and section 37 applied to section 211(a), it would still not define Germany as a person here.

This reading of section 37 is confirmed by the New York Court of Appeals' interpretation of the General Construction Law's predecessor—the Statutory Construction Law. Like section 37, section 5 of the Statutory Construction law "(Laws 1892, p. 1487, c. 677) provide[d] that ... '[w]hen used to designate a party whose property may be the subject of any offense, the term person also includes the state, or any other state, government or country which may lawfully own property in this state.'" *Saranac Land & Timber Co. v. Roberts,* 195 N.Y. 303, 88 N.E. 753, 760 (1909). The Court of Appeals asserted it was "clear, therefore, that the state could only be included as a 'person' when the statute relates to any of *its property* which may be the subject of an offense...." *Id.* (emphasis added); *Saranac Land & Timber Co. v. Roberts,* 125 A.D. 333, 109 N.Y.S. 547 (3d Dep't 1908) ("The word 'person,' as above defined in section 5 of the statutory construction law, does not include the Forest Commission. Nor does it include the state, except when its property is the subject of an offense ...."); *cf. Le Roux v. New York,* 307 N.Y. 397, 121 N.E.2d 386, 390 (1954) (finding New York was a person under section 1904–a of the Penal Law by virtue of section 37 of the General Construction Law where New

16. As noted in footnote 1, Germany questions World Holdings's ownership with regard to a majority of the bonds.

York owned the well and property that plaintiff was injured on).

The Court's interpretation—that the definition of a "person" in CPLR section 211(a) is narrow and does not include Germany—is further buttressed by the statute's legislative history.[17] Prior to 1941, New York had a 20–year statute of limitations on sealed instruments. *See* Report of the Law Revision Commission 1950 and New York Legislative Documents No. 65H, 1950 (hereinafter "Doc. 65H"), at 195. Then, in 1941, New York shortened the limitations period to six years. *See id.* This led to certain "disadvantageous" results, namely meritorious claims were barred. *See id.*

In the mid to late 1940s, "[c]onsiderable amounts of bonded indebtedness of the State had become due...." *Id.* at 201. Due to many reasons—including WWII—bondholders were not able to timely present their bonds for payment. *See id.* Consequently, New York declined paying on many bonds. *See id.*

In 1950, at the time Document 65H was written and when New York was considering whether or not to extend the limitations period on certain bonds back to 20 years, New York was "contemplat[ing] the sale of over eight hundred millions of dollars in bonds...." *Id.* Given the short length of New York's limitations period, New York's then-recent refusal to honor debts, and the comparatively longer limitations periods of neighboring states, there was concern about the market for New York bonds. *See id.* at 201–02. New York therefore determined it would be optimal to extend the limitations period on bonds, "with respect to obligations of the State and its municipalities" back to 20 years. *Id.* at 202.

New York, however, ran into issues with the New York Constitution. Under Article 3, Section 19 of the New York Constitution (as it existed in 1950[18]), if New York revived certain barred claims against New York, it would have to similarly revive claims " 'as between citizens of the state.' " *Id.* (quoting N.Y. CONST. art. 3, § 19). Thus, New York recognized if it just made a blanket change, broadly extending the statute of limitations to 20 years for all sealed instruments, this would "retrospectively disturb[ ]" private businesses without good cause. *Id.* New York thus endeavored to draft section 47–b (now CPLR section 211(a)), while generally applicable, to only catch state and municipal bonds, and certain "non-public obligations which are similar to them in their essential nature...." *Id.* at 209. To only capture only those limited classes of debtors, New York confined section 47–b to unsecured obligations "based only on the faith and credit of the issuer" (and other limits), as only the state and its municipalities are wont to do. *See id.*

Understanding New York's concerns at the time it re-extended certain limitations periods to 20 years compels the conclusion that New York desired this 20–year period to apply to very few "non-public" obligations in addition to New York's and its municipalities' obligations. Looking at CPLR section 211(a) through this prism, the Court cannot accept World Holdings's argument that this section should be broadly read. (*See* Summ. J. Hr'g 20:5–7). It is clear that New York did not want this exception to swallow the rule.

17. The legislative history—the Report of the Law Revision Commission 1950 and New York Legislative Documents No. 65H, 1950—concerned the CPLR's predecessor, the Civil Practice Act. Civil Practice Act section 47–b contained nearly identical language as CPLR section 211(a), and is identical in all relevant and important aspects.

18. This clause was later amended again in 1964.

### 2. The Bonds Are Secured by More Than Just "a Pledge of the Faith and Credit of the Issuer."

The New York 20–year statute of limitations applies where the bonds are "secured only by a pledge of the faith and credit of the issuer. . . ." N.Y. C.P.L.R. § 211(a) (McKinney 2011). World Holdings asserts this is the case with the Dawes and Young Bonds. (*See* Mot. Opp'n 15–23). Germany disagrees. (*See* Mot. 6–7; Reply 8–10).

The Dawes Bond states it is "collateral[ly] secur[ed]" by certain customs and taxes:

> The amounts required for the service of the loan are specifically secured by a first charge on all payments provided for under the experts' plan to or for the account of the agent-general for reparation payments and it is also declared and agreed with the like approvals as aforesaid that the said amounts required for the service of the loan are specifically charged by way of collateral security as a first charge on the gross revenues of the German Government from the customs and from the taxes on tobacco beer and sugar and from the net revenue of the German Government from the spirits monopoly and also on such other taxes (if any) that may hereafter be specifically assigned by the German Government for the purposes of securing the German budgetary contributions in accordance with the experts' plan.

(Dawes Bond ¶ 5) (all-capitals omitted). Similarly, the Young Bond states it is "collateral[ly] guarantee[d]" by a tax on the German Railway Company:

> (a) . . . [T]he German Government has undertaken to pay the Bank for International Settlements for the benefit of the other parties to the Hague Agreement . . . Six Hundred and Twelve Million Reichsmarks per annum during the period therein specified and in respect of both the said postponable annuities and the unconditional annuities has constituted as collateral guarantee a special tax payable to the German Government by the German Railway Company and has undertaken subject to the charge securing the German External Loan 1924 [Dawes] to reserve free from any charge securing any loan or credit in priority to or pari passu [19] with the said postponable and unconditional annuities the proceeds of the Customs the Tobacco Taxes the Beer Tax and the Tax on Spirits (Administration of the Monopoly) and such additional revenues as may be required by the Bank of International Settlements pursuant to the conditions contained in the Hague Agreement.
>
> \* \* \*
>
> XI. Pursuant to the Hague Agreement the annual direct tax of Six Hundred and Sixty Million Reichsmarks payable to the German Government by the German Railway Company shall be and remain constituted as collateral guarantee in respect of the payments therein specified including the payments provided to be made by the German Government pursuant to Article IX sub-clause (a) hereof.

(Young Bond ¶¶ (a), XI). Despite using terms such as "collateral security," "collateral guarantee," and "secured," World Holdings maintains the above-quoted clauses refer to moneys deposited into a sinking fund and are a mere description of how Germany's faith and credit was "ensured." (Mot. Opp'n 16–17).

#### a. A Pledge of Faith and Credit.

▮▮▮▮ A pledge of faith and credit is "is both a commitment to pay and a com-

---

**19.** "[Latin 'by equal step'] Proportionally; at an equal pace; without preference <creditors of a bankrupt estate will receive distributions *pari passu* >." Black's Law Dictionary (9th ed. 2009).

mitment of the [entity]'s revenue generating powers to produce the funds to pay." *Flushing Nat'l Bank v. Mun. Assistance Corp. for N.Y.*, 40 N.Y.2d 731, 390 N.Y.S.2d 22, 358 N.E.2d 848, 851 (1976). "Hence, an obligation containing a pledge of the city's 'faith and credit' is secured by a promise both to pay and to use in good faith the city's general revenue powers to produce sufficient funds to pay the principal and interest of the obligation as it becomes due." *Id.* A pledge of "full faith and credit" does not create any "lien" on some unspecified revenue stream. *Id.* (quoting *Florida v. Citrus Cnty.*, 116 Fla. 676, 157 So. 4, 11 (1934) (en banc)); *see also Sacramento Mun. Util. Dist. v. Spink*, 145 Cal.App.2d 568, 303 P.2d 46, 54 (1956) (citing *Florida v. City of Lakeland*, 154 Fla. 137, 16 So.2d 924, 924–26 (1944) (en banc)). Rather, a "full faith and credit" pledge " 'acknowledge[s] an indebtedness for the amount of money received as a consideration for the bonds, which indebtedness will become enforceable in an ordinary action, should the special contractual obligation as embraced in the bond itself, fail.' " *Flushing Nat'l Bank*, 390 N.Y.S.2d 22, 358 N.E.2d at 851 (quoting *Citrus Cnty.*, 157 So. at 11). A " 'faith and credit' obligation" can be distinguished from a " 'revenue' obligation, which is limited to a pledge of revenues from a designated source or fund." *Id.* (citing *City of Lakeland*, 16 So.2d at 924–26).

### b. The Dawes Bonds are Secured by More than Germany's Faith and Credit.

 Looking first at the Dawes Bond, the Court finds that it is secured by more than a pledge of Germany's faith and credit. The text of the Dawes Bond compels this result. Paragraph 4 of the Dawes Bond outlines Germany's pledge of its full faith and credit. (*See* Dawes Bond ¶ 4). Although not using those precise terms, this reading is confirmed by the parenthet-

ical in the first sentence of Paragraph 5. The Dawes Bond then goes on, in Paragraph 5, to state that "in addition to" the obligations contained in Paragraph 4 (Germany's faith and credit), the Dawes Bonds are secured by specific taxes on beer, sugar, and spirits. (*Id.* ¶ 5). The use of the modifier "in addition to" indicates that the Bonds are secured by Germany's faith and credit, *as well as* the tax revenues. The use of the "in addition to" language strongly indicates that the tax revenue is not merely describing how that faith and credit is *ensured*.

Nevertheless, World Holdings contends these paragraphs simply discuss the moneys placed into the sinking fund and how Germany's faith and credit was ensured. (*See* Mot. Opp'n 16–17). And World Holdings points out that CPLR section 211(a) permits sinking funds to exist while still falling within the 20–year statute of limitations. *See* N.Y. C.P.L.R. § 211(a) (McKinney 2011) ("regardless of whether a sinking fund is or may be established for its redemption....").

A sinking fund is "[a] fund consisting of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt." Black's Law Dictionary (9th ed. 2009). As described by World Holdings's expert, "[w]ith a sinking fund provision, the borrower is required to provide funds to the issue's [sic] trustee to retire a specific portion of the bond issue each year." (Andrea Heuson Decl. 4, Mot. Opp'n Ex. H [ECF No. 215–16] ). Notably, Dawes–Bond Paragraph 5 does not require Germany to deposit funds anywhere. (*See* Dawes Bond ¶ 5).

Dawes–Bond Paragraphs 7, 8, and 9 do, however, discuss those funds Germany paid to the trustee. Paragraph 7 states that Germany had to set aside and pay to the trustee, 15 days prior to a payment's due date, a sum "payable in accordance

with the provisions of Clause 6." (*Id.* ¶ 7). Similarly, Paragraph 8, in referring to moneys paid to the trustee, then cites "payments required by Clauses 4 and 7." (*Id.* ¶ 8). Notably, Paragraph 4 is the provision referring to Germany's faith and credit. Paragraph 9 then discusses moneys under the control of the trustee. (*See id.* ¶ 9). These paragraphs, discussing the payments to the trustee, reference payments as required in Paragraphs 4, 6, and 7. (*See id.* ¶¶ 7, 8, 9). They never mention Paragraph 5 or payments thereunder. (*See id.*). In fact, the Dawes Bond contains no paragraph discussing "payments" under Paragraph 5. This compels the conclusion that Paragraph 5, unlike Paragraphs 4, 6, and 7, did not require payments to the trustee for the sinking fund; Paragraph 5 is simply a second security interest. As a result, the Dawes Bonds were secured by more than just the faith and credit of Germany. And therefore, even if Germany was a "person" under CPLR section 211(a), the Dawes Bonds would not fall within section 211(a) because they were secured by more than Germany's faith and credit. *See Flushing Nat'l Bank*, 390 N.Y.S.2d 22, 358 N.E.2d at 851; *Sacramento Mun. Util. Dist.*, 303 P.2d at 54; *City of Lakeland*, 16 So.2d at 924–26; *Citrus Cnty.*, 157 So. at 11.

### c. The Young Bonds are Secured by More than Germany's Faith and Credit.

Like the Dawes Bonds, the Young Bonds were secured by more than just Germany's faith and credit. They were also secured by a special Railway Tax. (*See* Young Bond ¶¶ (a), XI). World Holdings again seeks to persuade the Court that these tax moneys were used to endow the

sinking fund. (*See* Mot. Opp'n 18). Its arguments, however, miss the [Reisch-]mark.

 Paragraph XI explicitly labels the German Railway tax a "collateral guarantee" that guarantees the payments from Paragraph IX(a). (Young Bond ¶ XI). The payments in Paragraph IX(a) are "part of the unconditional annuities which are the direct and unconditional obligation of the German Government...." (*Id.* ¶ IX(a)). These Paragraph 9 payments are "[f]or the purpose of providing the amounts required for paying or providing for interest and redemption and all other monies payable by the German Government under these presents and the Bonds of the Loan...." (*Id.* ¶ IX). For this purpose, Paragraph IX requires Germany to pay to the bank amounts "equal[ing] two-thirds of the amounts required for the service monies ..., and the said payments forming part of the unconditional annuities shall operate to discharge the German Government" to the extent of equivalent Reischmark amounts. (*Id.* ¶ IX(a)). Nowhere in Paragraphs IX or XI do the Young Bonds state the tax moneys were to be used to directly endow the sinking fund. Rather, the tax, as a "collateral guarantee," simply secured the payments from Paragraph IX(a), in addition to Germany's faith and credit. (*Id.* ¶ XI). Because the Young Bonds are also secured by the railway tax, the bonds were secured by more than Germany's faith and credit. *See Flushing Nat'l Bank*, 390 N.Y.S.2d 22, 358 N.E.2d at 851; *Sacramento Mun. Util. Dist.*, 303 P.2d at 54; *City of Lakeland*, 16 So.2d at 924–26; *Citrus Cnty.*, 157 So. at 11. As a result, even if Germany were a "person," CPLR section 211(a) and its 20-year statute of limitations does not apply to the Young Bonds.[20]

---

**20.** It is not surprising that Germany secured its bonds by more than just its faith and credit. In the early 1920s, Germany was coming off a loss in WWI, the Mark as a currency had collapsed, Germany's economy had collapsed, and Germany was in dire need of capital. *See* ENCYCLOPEDIA BRITANNICA, *Germany*. Given these economic realities, the added collateral guarantees—from the taxes—

## IV. CONCLUSION

Not assenting to the LDA was risky, and the risk was well known. The LDA drafters acknowledged this risk. (*See* Meeting Minutes I, at 18). *The New York Times* acknowledged this risk. *See* Paul Heffernan, N.Y. TIMES, *Old German Bonds Offer Financial Dilemma,* Oct. 27, 1958, at 41 ("The non-assenting bondholder must therefore decide ... whether the bird in the hand is worth two in the bush."). And as the Court noted in its earlier summary judgment order, "World Holdings purchased the Bonds 'with full knowledge of these treaty obligations and the resulting risk [it] was undertaking.'" *World Holdings,* 794 F.Supp.2d at 1335, 2011 WL 2217495, at *26 (quoting *Teplin v. Fed. Rep. of Ger.,* No. 81–1874, 690 F.2d 1060, 1982 U.S.App. LEXIS 12629, at *3 (D.C.Cir. Aug. 18, 1982)). The Court also stated that "[n]on-assenters risked that payment might not come for many years, *if at all* ...." *Id.* at 1331, at *23 (emphasis added). For World Holdings, as a non-assenter, it appears payment will not come at all.

For the above-cited reasons, World Holdings's claims on the 136 validated bonds are time-barred. Finding no disputed issues of material fact, it is

**ORDERED AND ADJUDGED** that Defendant, the Federal Republic of Germany's Motion for Summary Judgment [ECF No. 208] is **GRANTED.**

were likely necessary to ensure the bonds were actually purchased.